Statement of the Case.
MONROE, J.
The state of Louisiana asserts title to, and prays to be recognized as owner and put in possession of, certain bodies of water, with the soil under them, which, if they could be said to have been included in a certain examination, or survey, to which we will refer hereafter, would be parts of township 11 south, range 19 east, Southeastern district of Louisiana, east of the Mississippi river; said township forming part of the peninsula of the parish of St. Bernard, which extends eastward from the mainland and is bounded on the north by Lake Borgne and Mississippi Sound, and on the south and east by other sounds and bodies of water connecting those mentioned with the Gulf of Mexico. This peninsula and the bodies of water in question are delineated upon a map which is annexed to plaintiff’s petition, whereon some of the said waters are designated (others being unnamed) as “Mississippi Sound,” “Johnson Bayou,” “Johnson Bay,” “Picnic Bay,” “Jones” or “Drum Bayou,” “Turkey Bayou,” and “Turkey Bay.” The waters are salt, are within the ebb and flow of the tides, abound in floating and shell fish, and cover the bottoms to a depth, varying in different places, of from 2% to 12 feet.
Defendant alleges that it acquired the property in question, through mesne conveyances, from plaintiff, and that plaintiff acquired it from the government of the United States, as swamp and overflowed land, agreeably to the provisions of the acts of Congress of March 2, 1849 (Act March, 1849, c. 87, 9 Stat. 352), and September 28, 1850 (Act Sept. 28, 1850, c. 84, 9 Stat. 519); that, by selecting and accepting said property as swamp and overflowed land, inuring to her under said statutes, failing, at that time, to assert that she had acquired the same by virtue of her sovereignty, holding and offering it for sale, and finally selling it as public land, subject to sale, plaintiff relinquished and abandoned any prior or other title that she may have had, and has in effect estopped herself to assert the claim which is now set up; and that it (defendant) having bought said property in good faith, and paid the price fixed by plaintiff’s statutes, as for swamp and overflowed land which plaintiff was offering for sale, the divestiture, in the manner proposed, of the title so acquired, would amount *607 to a taking of private property for public use without just compensation and without due process of law. It is further alleged that, since acquiring the same, defendant has placed improvements on said property to a value exceeding $5,000, and that the judgment prayed for by plaintiff would leave defendant remediless with respect thereto.
It appears from the evidence that, in 1844r-45, an examination and partial survey was made, presumably by order of the Secretary of the Treasury, of the lands in the township in question, and that the field notes of the surveyor, together with a plat purporting to show said lands, as, also, the bodies •of water mentioned in plaintiff’s petition, were returned to, and certified by, the Surveyor General of Louisiana, who thereupon certified a list of said lands to the Secretary of the Treasury, by whom the same was approved. The plat shows fractional sections exclusively, but gives no calculations of the land areas and no indication of traverses of the bays and bayous, etc., which appear on it. The field notes contain frequent mention of lines running to the bodies of water, and to the coast, and not unfrequent mention of traverses of streams; 'but there is an explanatory note added by the surveyor which reads as follows:-
“Note. The boundary and section lines embraced in this book were not run — the face of the country being such as to render it impossible to extend the lines and establish durable corners. It is low marsh, subject .to overflow, except where noted, when easterly winds prevail; consequently wholly unfit for cultivation, which, of itself, is deemed sufficient cause not to justify the additional expense of running section and township lines. The traverse of the streams was taken for the purpose of getting, as near as practicable, a correct representation of the topography of the country.”
In 1852, agreeably to the provisions of the act of Congress of 1849, relative to “swamp and overflowed lands unfit for cultivation,” the lands included in the examination and partial survey so made were selected by, and approved to, the state of Louisiana, according to a list upon which the numbers of the sections were given and each section was credited with the full 640 acres. This list, however, contains the following statement, immediately above the signatures of the officers representing the state and federal governments, to wit:
“The estimated areas in the foregoing list are only intended as an approximation, to the true area, as, in many instances, there is not sufficient data to form a correct estimate.”
The purpose of the grant, as declared by the act of Congress, having been “to aid the state of Louisiana in constructing the necessary levees and drains to reclaim the swamp and overflowed lands therein,” the state, by Act No. 14 of 1892, created the “Lake Borgne Basin Levee District,” as an instrumentality for the accomplishment of that purpose, and, directing the State Auditor and Register of the State Land Office to convey to it all the lands so acquired, within said district, authorized the board of commissioners of said district to sell the lands and apply the proceeds to the completion of a levee system. As, however, the land areas had not been calculated, either when the original examination and partial survey was made, or at any time afterwards, the fractional sections were conveyed to the board of commissioners, as they had been conveyed to the state, by their numbers and as containing, each, 640 acres. Thereafter, by private act, of date September 16, 1898, the board of commissioners made a sale, by the following description, to Charles Sanger, to wit:
“Fractional south half of northeast quarter and fractional south half of section 15; east half fractional southwest quarter and fractional east half of northwest quarter of section 23; all of sections 22, 27 and 28; north half of section 33; north half of section 34; containing 3,440 acres; and the south half of northwest quarter and southwest quarter of section 23; west half of northeast quarter and northwest quarter of section 26; west half of northeast quarter and northwest quarter of *609 section 35; containing 880 acres; all situated in township No. 11, south, of range No. 19, east, * * * and aggregating 4,320 acres, according to the plats of the U. S. Surveyor General, on file in the office of said board of commissioners. All of said lands were acquired from the state of Louisiana under Act 14, approved June 21, 1892. * * * The consideration of this sale is tjtie sum of $540.00, cash, in hand paid. * * * It is understood that only such title is hereby conveyed as was acquired by the aforesaid act of 1892 and the deeds thereunder referred to.”
In January, 1900, Sanger sold three-fourths interest in the property so acquired by him to Hunt, Forsyth, and McGraw. In April, 1904, Hunt sold the interest thus acquired by him to Thompson, and in May, 1905, Sanger, Forsyth, McGraw, and Thompson sold the entire property to the defendant company. In the fall of 1908, the township in question was resurveyed, at the instance of the State Oyster Commission, and, the land and water areas having been calculated, it appears that there are 4,400 acres embraced within the description contained in defendant’s title, of which 2,776 acres are land and 1,623.47 acres consist of the bodies of water which, with the soil beneath them, are here claimed as the property of the state. We find in the record no evidence concerning the improvements referred to in the answer of the defendant. There was judgment in the district court in favor of the state, and the defendant has appealed.
Opinion.
[1] The jurisprudence of the country is now settled to the effect that, upon the acquisition of territory by the United States, whether by cession from one of the states, by treaty with a foreign country, or by discovery and settlement, the title to, and control of, all the tide lands became vested in the government, “for the benefit of the whole people, and in trust for the several' states, to be ultimately created out of the territory”; that, though the United States, whilst holding territory, as such, may grant,
for appropriate purposes, titles or rights in the soil below high-water mark, they have never done so, by any general laws, but, “unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters and in the soil under them to the control of the states, respectively, when organized and admitted into the Union”; that the states admitted into the Union since the adoption of the Constitution became at once entitled to the soil under their navigable waters, the same as the original states, and that nothing therein remained to the United States save the public lands, which do not include lands below high-water mark; that the general legislation of Congress in respect to public lands does not extend to tide lands, but is confined in its application to lands which are subject to sale or other disposal, under general laws; that “the soil beneath the great lakes and navigable waters, above as well as below the flow of the tide, properly belongs to the states, by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of high water”; that the titles and rights of riparian or littoral proprietors in the soil below high-water mark are governed by the laws of the several states, subject to the rights granted to the United States by the Constitution. Martin et al. v. Lessee of Waddell, 16 Pet. 367, 10 L. Ed. 997; Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565; Goodtitle ex dem. Pollard’s Heirs v. Kibbe, 9 How. 471, 13 L. Ed. 220; United States v. Pacheco, 2 Wall. 587, 17 L. Ed. 865; Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 225; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 35 L. Ed. 428; Knight v. U. S. Land Associa *611 tion, 142 U. S. 183, 12 Sup. Ct. 258, 35 L. Ed. 974; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Lowndes v. Town of Huntington, 153 U. S. 1, 14 Sup. Ct. 758, 38 L. Ed. 615; Mann v. Tacoma Land Co., 153 U. S. 273, 14 Sup. Ct. 820, 38 L. Ed. 714; Eldridge v. Trezevant, 160 U. S. 452, 16 Sup. Ct. 345, 40 L. Ed. 490; Gibson v. U. S., 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Morris v. U. S., 174 U. S. 196, 19 Sup. Ct. 649, 43 L. Ed. 946; Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; United States v. Mission Rock Co., 189 U. S. 391, 23 Sup. Ct. 606, 47 L. Ed. 865; Hardin v. Shedd, 190 U. S. 508, 23 Sup. Ct. 685, 47 L. Ed. 1156.
[2] It is evident, then, that the state of Louisiana did not acquire the soil here claimed, which lies beneath the waters of intercommunicating sounds, bayous, creeks, channels, lakes, bays, coves, and inlets, bordering upon the Gulf of Mexico and within the ebb and flow of the tide, by virtue of the acts of Congress of 1849 and 1850, but that she acquired them, upon her admission into the Union, by virtue of her inherent sovereignty. It is said, however, that the soil in question was approved by the United States and accepted by the state, as public lands subject to such disposal and acceptance under the act of 1849, and that the state is estopped to deny her own title. But that contention is not sustained by the fact. It may be assumed that the Governor of the state notified the Secretary of the Treasury, as provided by the act of 1849, that the state was ready to defray the expense, and that the Secretary thereupon caused “a personal examination to be made, under the direction of the Surveyor General thereof, * * * of all swamp lands therein which are” (were) “subject, to overflow and unfit for cultivation, and a list of the same to be made out,” which list, according to the statute, was certified by the Surveyor General to the Secretary and, by the latter, approved. The law did not, however, require a survey; it required, merely, that the Secretary of the Treasury should cause “a personal examination” to be made of the lands, and a list of them to be made out and certified to him, and it cannot be said that a survey was made, since the surveyor states in his report that the boundary and section lines were not run, because it was impossible to extend the lines and establish durable corners, and neither from his plat nor his notes is it possible to ascertain the acreage of the land examined by him. Hence, in forwarding the list, containing merely the numbers of the sections and attributing to each exactly 640 acres, the Surveyor General added to it the statement, which we have already quoted, to the effect that the estimated areas, as there represented, were only intended as approximations, and the list was approved in that way. Inasmuch, however, as the law authorized the conveyance to the state of all the “swamp and overflowed lands, unfit for cultivation,” and inasmuch as the report of the surveyor showed that all the lands in the township were of that character, it was immaterial whether ‘they were surveyed, or merely examined, and equally immaterial whether the sections contained, each, 640 acres, or more, or less. The effect of the written statement, incorporated in the selection and approved, was, however, to make clear and emphasize the fact that the land areas were only approximately estimated, and that the state was not selecting, and the Secretary was not approving, as land, the entire acreage called for by the list; hence the proposition that the selection and approval included the 1,623.47 acres of tide water bottoms, here claimed, which the state had owned, in her sovereign right, since her admission into the Union, is without support.
[3] The question which next presents itself is: What, if anything, has the states *613 done, with regard to the tide water bottoms so acquired, to provide a basis for the claim of title and possession set up by defendant? There is no doubt that she might have taken any action in regard to them which was not repugnant to the Constitution of the United States, and the treaties and laws made and enacted pursuant thereto. The state law upon the subject of such property, however, as found in the Civil Code, reads, in part, as follows:
“Art. 453. Public things are those the property of which is vested in the whole nation, and the use of which is allowed to all the members of the nation; of this kind are navigable rivers, seaports, roadsteads and harbors, highways and beds of rivers, as long a.s the same are covered with water. Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads and harbors. * * *
“Art. 455. The use of the banks of navigable rivers or streams is public; accordingly every one has a right freely to bring his vessels to land there, to make fast the same to the trees which are there planted, to unload his vessels, to deposit his goods, to dry his nets and the like. Nevertheless, the ownership of the river banks belongs to those who possess the adjacent lands.”
“Art. 509. The accretions which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream are called alluvion. The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for public use.
“Art. 510. The same rule applies to derelictions formed by running water retiring imperceptibly from one of its shores and encroaching upon the other; the owner of the land adjoining the shore which is loft dry has a right to the dereliction, nor can the owner of the opposite shore claim the land which he has lost. This right does not take place in derelictions of the sea.”
As far back as 1838, our predecessors in this court, applying the articles thus quoted, in a petitory action for the recovery of (what was called) a parcel of land upon the shore of Lake Pontchartrain, said:
“It appears.to us that the ground in question lies much below high-water mark and forms part of the bed of the lake, and is not, therefore, susceptible of private ownership.” Milne v. Girodeau, 12 Rob. 329.
In a later case, the plaintiff owned a lot situated upon the same lake shore and brought suit to be decreed the owner of the accretion, formed and to be formed, in front of it, and the court said:
“The plaintiff, however, denies that Lake Pontchartrain is either the sea or an arm of the sea, and, therefore contends that this question of accretions or alluvion on the sea shores has no applicability to this case. It might be a sufficient reply to this to say that the only acknowledged right to accretions, as property, under our law, are those formed on rivers and running streams, and that there is no recognition of any property right therein when formed on lakes, bays, arms of the sea, or other large bodies of water, and that the modes or ways of the acquisition of property are limited to those expressly prescribed by law, and cannot be extended by implication. But we consider this question virtually disposed of in the case of Milne v. Girodeau, 12 Rob. 329. * * * ” Zeller v. Yacht Club, 34 La. Ann. 839.
In a still later case, in which the plaintiff was asserting title to water bottoms in the same peninsula in which those involved in this suit are situated, the opinion of the court contains the following language:
“We conclude, then, that the grants under which plaintiff claims — being of land bordering upon, and partially surrounded by, the tide waters of the Gulf of Mexico — carry its titles no farther than high-water mark, and that, in so far as it (plaintiff) asserts ownership and possession, under such titles, of land lying beneath the waters which surround the tracts of dry land included in said grants, or lying beneath any navigable passes or channels which intersect such’ tracts or separate them from each other, the exception of no cause of action was properly maintained.” Louisiana Navigation Co. v. Oyster Commission, 125 La. 740, 51 South. 706.
[4] There has been considerable legislation, bearing, to some extent, upon the questions here presented, since the Civil Code was adopted; but it will be sufficient for the purposes of this case to inquire into the state of the law at the time that defendant’s author made his purchase, i. e., on September 16, 1898.
*615 Act 106 of 1886, p. 195, is entitled and reads, in part, as follows:
“An act to encourage, protect, regulate and de- • ' velop the oyster industry in the state of Louisiana, and imposing penalties for the violation of the provisions of this act.
“Section 1. * * * That all beds of the rivers, bayous, creeks, lakes, coves, inlets and sea marshes, bordering on the Gulf of Mexico, and all that part of the Gulf of Mexico within the jurisdiction of this state, and not heretofore sold or conveyed, by special grants or by sale by this state or by the United States, to any private party or parties, shall continue and remain ‘the property of the state of Louisiana, and may be used for the purposes of fishing and taking and catching oysters and other shell fish, subject to the reservations and restrictions hereinafter imposed, and no grant or sale or conveyance shall hereafter be made by the Register of the State Land Office to any estate, or interest of the state, in any natural oyster bed or shoal, whether the said bed or shoal shall ebb bare or not.”
And then follow a number of sections purporting to regulate the disposition of oyster bottoms, or beds, and the cultivation, catching, and sale of oysters.
As we have already stated, in 1892, the General Assembly created and delimited the Lake Borgne Basin Levee District (including therein the parish of St. Bernard), and established, as a body politic, a board of commissioners for its governance. Section 11 of the act provides, among other things:
“That, in order to provide additional means to carry out the purposes of this act, * * * all lands now belonging or that may hereafter belong to the state of Louisiana and embraced within the limits of the levee district as herein constituted shall be, and the same are, hereby, given * * * and delivered unto said board of commissioners of the Lake Borgne Basin Levee District, whether said lands or parts of lands were originally granted by the ■Congress of the United States to this state or whether said lands have been or may hereafter 'be forfeited to, or bought in by, or for, or sold tto, the state at tax sales, for non payment of faxes. * * * ”
Acts No. 110, of 1892, p. 142, and No. 121, of 1896, are framed upon the same lines and will be more particularly referred to hereafter. Other acts upon the same subject and containing the same reservations were passed in 1904, 1906, 1908, and 1910; and, in the year last mentioned, there was a special act passed reading as follows, to wit:
“Act No. 258.
“To declare the waters found in the bayous, lagoons, lakes, bays and rivers of the state to be the property of the state and the beds thereof.
“Section 1. * * * That the waters of and in all bayous, lagoons, lakes and bays and the beds thereof, within the borders of the state, not at present under the direct ownership of any person, firm, or corporation, are hereby declared to be the property of the state. There shall never be any charge assessed against any person, firm or corporation for the use of the waters of the state for municipal, agricultural or domestic purposes.
“Section 2. * * * That, while acknowledging the absolute supremacy of the federal government over the navigation on and in the navigable waters within the borders of the state, yet, nevertheless, it is hereby1 declared and affirmed that the ownership of the water itself and the beds thereof in said navigable streams is vested in the state and that the state has the right to enter into possession of said waters, when not interfering with the control of navigation exercised by the federal government therein; provided, this act is not intended to interfere with the acquisition, in good faith, of any waters or the beds thereof, transferred by the state or its agencies, prior to the passage of this act; and, provided, further that this act shall not affect the acquisition of property by alluvion or accretion.”
It thus appears that, 12 years before defendant or its author acquired the interest upon the basis of which they assert title to the property here claimed, the state had enacted a law declaring, in specific terms, that that property was reserved, and that the declaration so made was twice repeated in statutes enacted prior to said acquisition by defendant’s author (the one, in 1892, and the other, in 1896); that, at the same session at which the state made the donation to the board of commissioners of the Lake Borgne Basin Levee ’District, of its lands in said district, whether granted by Congress or acquired through tax sales, the General Assembly enacted one of the statutes referred to, of later date than the act *617 of donation, reaffirming tlie policy previously declared:
“That all beds of the rivers,_ bayous, creeks, lakes, coves and inlets bordering on the Gulf of Mexico, and all that part of the Gulf of Mexico within the jurisdiction of this state shall continue and remain the property of the state, * * * and may be used as a common by all citizens of the state for the purposes of fishing and taking and catching oysters and other shell fish, subject to the reservations and restrictions hereinafter imposed, and no grant or sale or conveyance shall hereafter be made by the Register * * * to any estate, or interest of the state, in any natural oyster bed or shoal, whether the said bed or shoal shall ebb bare or not; and the citizens of this state shall have the exclusive privilege to fish or take oysters in any natural bed or shoal, subject to the restrictions hereinafter .imposed.” See Act 110, of 1892, p. 142.
If, however, it could be supposed that the act making the donation to the Levee Board, which refers only to lands granted by Congress and acquired through tax sales, and which became a law before the other, controlled the later enactment which we have just quoted, and which concerns lands that were acquired in neither of the ways mentioned, and we could impute to the General Assembly, as the result of construing the two acts together, the intention of saying, at one and the same session, that its tide water beds, bordering on the Gulf of Mexico, should continue and remain the property of the state, to be “used as a common by all citizens of the state,” and that those same tide water beds should be placed at the disposal of the Levee Board, to be sold to the first comer, there yet remains the Act 121, of 1896, the first section of which is, totidem verbis, a reproduction of the first section of the act of 1892, above quoted; the sécond section of which reads:
“That the rights of the owner or occupant of land on any of the shores of bays, bayous, inlets and lakes shall extend to ordinary low-water mark; but it is not intended thereby to deprive them of the privilege of bedding or planting oysters, extended to all citizens of the state, under the several sections of this act and subject to the restrictions hereinafter imposed.”
And section 17 of which repeals the acts, of 1886 and 1892 and all other conflicting legislation.
It is clear, therefore, that when, more than two years later, defendant’s author acquired the interest upon which it relies, the board, from whom that interest was acquired, was utterly without authority to alienate the soil beneath the bayous, bays, coves, inlets, etc., and the oyster beds and shoals, which are here made the subject of dispute. Beyond that, and in order that no injustice may be done to the board of commissioners, it will be noted that the sale to Sanger was made according to the plat, prepared by the government surveyor in 1844-45, upon which plat the areas here claimed by the state are as distinctly delineated, as bayous, bays, coves, and inlets, as they are upon the map annexed to the plaintiff’s petition; and though the conveyance from the board to Sanger purports to fix the acreage of the land conveyed, in spite of the fact that it had never at any time been calculated and had been merely estimated in the conveyance from the state to board, the conveyance to Sanger was nevertheless a conveyance of public lands which the state held for sale, and did not purport to be a conveyance of navigable and tide waters and water, bottoms, which the state was holding in trust for all of her citizens.
It may be, and probably is, true that there is no legal impediment in the way of the state’s alienating such property in favor of particular individuals or corporations, Save in so far as such alienations might conflict with the power vested in Congress to regulate interstate and foreign commerce; but, as we have already seen, her declared policy has always been not to do so, and any statute or contract from which such effect were claimed would, necessarily, be strictly construed against the grantee.
In Martin et al. v. Lessee of Waddell, su *619 pra, Taney, C. J., speaking for the Supreme Court of the United States, said:
“We do not propose to meddle with the point, which was very much discussed at the bar, as to the power of the king, since Magna Charta, to grant to a subject a portion of the soil covered by the navigable waters of the kingdom, so as to give him an immediate and exclusive right of fishery, either for shell fish or floating fish within the limits of his grant. The question is not free from doubt, and the authorities referred to in the English books cannot, perhaps, be altogether reconciled. But, from the opinion expressed by the justices of the Court of King’s Bench in the case of Blundell v. Caterall, 5 Barn. & Ald. 287, 294, 304, 309, and in the case of Duke of Somerset v. Fogwell, 5 Barn. & Cress. 883, 884, the question must be regarded as settled in England against the right of the king, since Magna Charta, to make such a grant.”
Considering, in the same case, the question whether the charters granted by Charles II to his brother, the Duke of York, conferred upon the latter the right to dispose, as of his private property, of the soil lying beneath Raritan river and bay, in the state of New Jersey, the learned Chief Justice said:
“The dominion and property in navigable waters and in the lands under them, being held by the king, as a public trust, the grant to an individual of an exclusive fishery, in any portion of it, is so much taken from the common fund intrusted to his care for the common benefit. In such cases, whatever does not pass by the grant still remains in the crown, for the benefit and advantage of the whole community. Grants of that description are therefore construed strictly, and it will not be presumed that he intended to part from any portion of the public domain unless clear and especial words are used to denote it.”
Counsel for defendant seem to rely, somewhat, upon the decisions of this court in the cases of McDade v. Bossier Levee Board, 109 La. 625, 33 South. 628, Hall v. Board of Commissioners, 111 La. 913, 35 South. 976, and Ghauvin v. Oyster Commission, 121 La. 10, 46 South. 38. The two cases first mentioned involved the ownership of lands left dry by the reliction of nonnavigable waters, in the northern part of the state, .and presented questions which are governed by different principles and precedents from those which are to be here decided. The third case mentioned was decided (on rehearing) in favor of the plaintiff, on the ground that the defendant was without capacity to stand in judgment for the state with respect to the validity of the patent under which plaintiff asserted title. It was stated in the opinion :
“The state cannot be bound with respect thereto” (referring to the title in dispute) “by any judgment which may be herein rendered, and, as between the plaintiff and the state, such judgment must leave that question entirely at large.”
For the reasons thus assigned, the judgment appealed from is affirmed.