(138 So. 84)

**STATE et al. v. ERWIN et al.**

No. 30695.

March 30, 1931.

On Rehearing Nov. 30, 1931.

Percy Saint, Atty. Gen., for the State.

Milling, Godchaux, Saal & Milling, of New Orleans, Charles H. Blish, of Shreveport, and F. J. Winter, of Houston, Tex., for appellant Louisiana Land & Exploration Co.

Cullen R. Liskow, of Lake Charles, for appellees Calcasieu Oil Co., Inc., and others.

Yandell Boatner, of Shreveport, for appellee Magnolia Petroleum Co.

Beeman Strong, of Beaumont, Tex., and Pujo, Bell & Hardin, of Lake Charles, for appellee Yount-Lee Oil Co.

Moss & Siess, of Lake Charles, for appellee Calcasieu Development Co., Inc.

J. S. Atkinson, of Shreveport, and McCoy, Moss & King, of Lake Charles (J. E. Green, Jr., of Houston, Tex., of counsel), for appellees M. P. Erwin and another.

Huey P. Long, of Baton Rouge, and Jas. Wilkinson, of New Orleans, amici curiæ.

OVERTON, J.

This is an action to try title, brought by the state of Louisiana and the Louisiana Land

& Exploration Company, the assignee of the state's lessee. The land involved is located at Hackberry, in the parish of Cameron, and, though once above water, is now under the waters of Calcasieu Lake. This condition of the land is due almost entirely, if not entirely, to the washing away of the surface of the land by the waves on the lake. The land, which abuts the present waters of the lake at the point in contest, is owned by some of the defendants, who contend that their property lines extend to a meander line, run in 1833, by the United States government, through H. T. Williams, surveyor, which they adopt as the shore line of the lake in 1812, when Louisiana was admitted into the Union as a state. Their contention is that the patents, under which they hold, convey title to this line, and that the only part of the bed of Calcasieu Lake, which the state owns is that part which was its bed in 1812, when Louisiana was granted statehood. Others of the defendants who own mineral leases or other mineral rights emanating from their codefendants, who assert ownership in the lands, adopt the same position that their codefendants do. On the other hand, it is the contention of plaintiffs that, as the lands are washed away by the waves, or as they are worn away by other natural process, and become, by the extension of the waters of the lake over them, a part of the bed of the lake, to that extent title to them vests immediately in the state by virtue of its sovereignty.

Whether the patents to the lands owned by those of the defendants, who claim as owners, convey title to the meander line, established in 1833, or not, it is certain that large parts of their lands have been worn away by the waters of the lake since the issuance of their patents, and that the resulting extension of the bed of the lake is claimed by the state. The strip of land in contest now forming a part of the lake, roughly estimated, ranges between the meander line of 1833 and the present shore line, from 50 to 1,000 feet in width, and has a length of several thousand feet. The strip is located on the western side of the lake, at a point where Bayou Kelso empties into the lake, at Hackberry Island. It is covered by the waters of the lake to depths ranging, say, from 1 to 3 feet. What gives to the strip value is that oil was discovered in the lake on each side of the strip several years ago in paying quantities, and is still being produced at these points.

The lake is approximately 18 miles long. It varies in width from about 4½ miles to about 12 or 14 miles. At its northern end the Calcasieu river enters it through what is known as Mud Lake, and leaves it at its southern end, on its way to the Gulf of Mexico, a few miles distant. The river, before entering the lake, is 600 or more feet in width, and drains a considerable territory. It is deeper than the lake, especially north of it, where it is considerably deeper. It has what is considered a channel through the lake, which, we gather, is slightly deeper than the rest of the lake. Through this channel, which is about 1,000 feet wide, and which is some distance from the land in controversy, there is a perceptible current when the river, due to heavy rains, is high. In ordinary stages of the water in the river, there is, if any, only an almost imperceptible current in the channel. In very high water, a slight current has been noticed in the vicinity of the land here involved, but it is not thought that the current is sufficient to cause an erosion of the shores. These wear away at the point here involved to the extent of 5 or 6 feet a year.

The lake is affected more or less by the tides, especially at the southern end, up to which point they frequently flow. As a whole, its waters are usually fresh, though some-

times they are brackish, and occasionally, due to weather conditions, are quite salt. The lake has an approximate depth of 6 feet, and is, perhaps, slightly deeper in that part of it that may be considered the channel of the river. The lake is navigable, and was navigable in 1812, when Louisiana was admitted as a state of the Union.

■ As the lake was a navigable body of water on the day Louisiana was admitted to statehood, all of its bed as it then existed below high-water mark became the property of the state, without grant, by virtue of its inherent sovereignty. State v. Bozeman, 156 La. 635, 101 So. 4.

Hence the case is presented: To whom does that part of the bed of the lake belong, formed by the washing away of the soil, since the admission of Louisiana to statehood? The correct solution of the case depends, among other things, upon the proper application of the laws of accretion and dereliction. These, so far as pertinent, are contained in articles 509 and 510 of the Civil Code. Article 509 reads as follows:

"The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.

"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or a stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."

Article 510 reads as follows:

"The same rule applies to derelictions formed by running water retiring imperceptibly from one of its shores and encroaching on the other; the owner of the land, adjoining the shore which is left dry, has a right to the dereliction, nor can the owner of the opposite shore, claim the land which he has lost. This right does not take place in case of derelictions of the sea."

It may be observed that articles 556 and 557 of the French Civil Code are substantially, and in fact almost literally, the same as the corresponding articles 509 and 510 of our Code. However, the French Civil Code contains another article—article 558—which was not carried from the Code Napoleon into our Code, and which reads as follows:

"Alluvion does not take place in connection with lakes and ponds, and the owner thereof always retains the land covered by the water, when it reaches the height of the outlet of the pond, even if the volume of water should decrease.

"On the other hand, the owner of a pond does not acquire any rights to the riparian lands which the water covers in case of extraordinary rise." Cachard's French Civil Code, art. 558.

In the Succession of Delachaise v. Maginnis, 44 La. Ann. 1043, 1048, 11 So. 715, 716, it was said:

"The principle underlying and determining the title to alluvion, in our system, is the equitable one expressed in the maxim, qui sentit onus, sentire debet et commodum. As Pertalis, in his 'Exposé des Motifs' of the Napoleon Code, quaintly states it: 'There exists, so to speak, an aleatory contract between the riparious owner and nature, whose action may at any moment despoil or increase his estate. In which sense it may be said that rivers give or take away, like chance or fortune.' If it takes away, the owner must bear the loss; if it gives, justice accords him the gain."

■ The fact that our Code omits article 558 of the French or Napoleon Code does not indicate that it was the intention of the framers

of our Code to make the rules concerning alluvion and dereliction apply to lakes. The omission of article 558 from our Code made no difference. Article 509 thereof grants the right of accretion to the owners of land abutting on rivers and streams, thus limiting the right, under the rule, enumeratis unius est exclusio alterius, to such owners, and indicating by the use of those terms, that the bodies of water must be running water, confined by banks, and the same rule applies as to relictions, the right to which is granted by article 510, where the term "running water" is used. This, in effect, has been held in Slattery v. Arkansas Gas Co., 138 La. 793, 804, 70 So. 806, and Bank of Coushatta v. Yarborough, 139 La. 510, 517, 71 So. 784, where it was virtually said that articles 509 and 510 of our Code do not apply to lakes.

Our conclusion is that these articles do not apply to lakes. Hence the question is presented whether Calcasieu Lake is a lake or a section of the Calcasieu river, within the contemplation of the laws governing accretion and derelictions?

■ In France, from which our Civil Code is largely taken, what is termed Calcasieu Lake would probably be considered a mere expansion of the Calcasieu river, and therefore the entire lake would likely be treated as a section of the river, for there a lake through which a river flows, though called a lake, is deemed, in the application of the laws governing alluvion and dereliction, a section of the river. Dictionnaire Generale du Notariat et du Droit Civil Moderne, vol. 4, page 350, sub. "Lac;" Repertoire du Droit Francais, Fuzier Herman, vol. 25, page 783, sub. "Lac," No. 13, vol. 4, p. 57, Nos. 47 and 48, sub. "Alluvion," vol. 33, p. 235, No. 734, sub. "Riviere." In our opinion, however, the better view—with reference to the laws, governing alluvion and dereliction—is to regard such a vast expanse of water as Calcasieu Lake as being in fact a lake, although a river empties into the sea through it.

In Jones v. Lee, 77 Mich. 35, 43 N. W. 855, 856, in speaking of a lake, in which the Muskegon river enters, the lake emptying through a short passage into Lake Michigan, it was said:

"There is no rule of law which would authorize this body of water, merely because it is a theoretical expansion of a river, to be treated as anything but a navigable lake, which would not put the expansions of the St. Lawrence on a similar footing. A river is characterized by its confining channel banks, which give it a substantially single course throughout. A lake occupies a basin of greater or less depth, and may or may not have a single prevailing direction." See, also, Nee-pee-Nauk Club v. Wilson, 96 Wis. 290, 71 N. W. 661; Illinois Steel Co. v. Bilot, 109 Wis. 418, 84 N. W. 855, 85 N. W. 402, 83 Am. St. Rep. 905; Alabama v. Georgia, 23 How. 505, 16 L. Ed. 556, 559, the last case, defining the word, "river."

■ One may lose or acquire property only by one of the methods prescribed by law. Zeller v. Southern Yacht Club, 34 La. Ann. 837; Sapp v. Frazier, 51 La. Ann. 1718, 1726, 26 So. 378, 72 Am. St. Rep. 493. It cannot be said that the state acquired the property in contest by virtue of its sovereignty, as it did the bed of the lake, as the bed existed, at the time the state was admitted into the Union, for whatever title the state may have to the land in contest is purely a derivative title. The only remaining method presented by which the state could have acquired the property is under the laws relating to accretion and dereliction. Since these laws do not apply to lakes, and since Calcasieu Lake is properly a lake, and not a section of a river or stream, it would therefore seem that,

as the water washed away parts of the surface of defendants' lands, by the action of the waves, thereby making the subsurface of these parts a part of the bed of the lake, the state did not acquire such subsurface, and the defendants did not lose it. Hence the state's claim of title to such parts must fall.

In conflict with the conclusion, here reached, would seem to be a ruling in the quite recent case of New Orleans Land Company v. Board of Levee Commissioners of Orleans Levee District, 171 La. 718, 132 So. 121, 123. In that case it appears that the board of levee commissioners appropriated certain land, claimed by the New Orleans Land Company, the greater part of which, by virtue of the erosive action of the waters of Lake Pontchartrain, had become a part of the bottom of the lake. In awarding damages for the land appropriated, the court refused to allow any for that part of the land submerged, and, in giving its reasons leading to this refusal, said:

"In determining the issues involved in this case, it is of no practical value to ascertain whether Lake Pontchartrain should be classed as a salt-water tidal lake or a fresh-water inland navigable lake. The legal situation with which we are concerned here is the same in either case. The water bottoms of both classes of lakes are owned by the state to the high-water mark."

So far as relates to fresh water navigable lakes, with which we are presently alone concerned, there can be no question that their bottoms belong to the state, up to the high-water mark, by virtue of its sovereignty. But this means their bottoms, as they existed, at the time the state was admitted into the Union, and does not include that part of such bottoms, later formed by the action of the waters in washing away the soil of lands, privately owned, and thereby submerging them. The

submerged lands still belong to the owners. The New Orleans Land Company Case, to this extent, must yield to the views herein expressed. It may be said that the question there presented, as to ownership of the submerged part, played no important part in that controversy, for, being submerged, and with nothing apparent to add to its desirability, it obviously had but little, if any, value in private hands.

The trial judge rendered judgment, rejecting plaintiffs' demands, and decreeing defendants to be the owners of the lands and of the respective interests therein claimed by them and situated between the present shore line of Calcasieu Lake, and the eastern boundary line of their property as originally acquired from the United States and the state, and reserving to the parties to this suit the right to institute any necessary proceedings in the future for the purpose of locating and having fixed the boundary line existing between the defendants' properties and those belonging to plaintiffs, according to the boundary originally existing.

Understanding from this judgment that the eastern boundary line of defendants' property is to be fixed, when the proper proceedings are had, at the ordinary high-water mark, as it existed at the time the land was patented, which mark the record does not disclose, the judgment appealed from should be affirmed, for the presumption is that the patents conveyed title only up to the water line at the date of their issuance, and it is ordinarily contrary to the policy of a state for it to alienate any part of the bed of its navigable waters. Massachusetts v. New York, 271 U. S. 65, 87, 46 S. Ct. 357, 70 L. Ed. 838, 849; Morris v. United States, 174 U. S. 196, 235, 19 S. Ct. 649, 43 L. Ed. 946, 960; State v. Bayou Johnson Oyster Co., 130 La. 604, 612, 58 So. 405.

The judgment is affirmed.

ST. PAUL, ROGERS, and BRUNOT, JJ., dissent.

ROGERS, J. (dissenting).

I am in accord with the view expressed in the majority opinion that the considerable body of water lying in the parishes of Calcasieu and Cameron, and geographically known as Calcasieu Lake, should be regarded as a lake and not as a river. But I am not in accord with the view therein expressed as to the legal principles that follow from a recognition of that fact.

Calcasieu Lake is a widened part of Calcasieu river. There is a continuous current flowing down the river, through the lake, into the Gulf. The velocity of this current varies with the seasons, being considerable in the wet season and inconsiderable in the dry season. The water level in the river, below and above the lake, and in the lake itself, varies according to the direction and velocity of the winds and according to the variation of the tides in the Gulf.

It is not disputed that Calcasieu Lake is a navigable body of water, nor that the land involved, due to the action of natural forces, is covered by the waters of the lake. The land, therefore, is a part of the lake bed. As such, I respectfully maintain, it is insusceptible to private ownership.

At the outset, I think it is pertinent to remark, on no lesser authority than the Supreme Court of the United States, that it is against public policy for the ownership of the soil below the water surface of a navigable body of water to be vested in a private individual. Vide, Barney v. City of Keokuk, 94 U. S. 324, 337, 338, 24 L. Ed. 224, 228.

And it is a recognized legal principle in this country that the title to the soil beneath the waters of a navigable lake is in the state, and not in the owner of the abutting soil.

Verbo, "Lake," Bouvier's Law Dict. (Rawle's Revision) vol. 2, p. 104.

Imbedded in our own jurisprudence is the principle that the titles to the beds of all navigable waters are vested in the state by virtue of its inherent sovereignty. La. Navigation Co. v. Oyster Commission, 125 La. 740, 51 So. 706; State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405, 407; State v. Capdeville, 146 La. 94, 83 So. 421, 425; State v. Bozeman, 156 La. 635, 101 So. 4.

In State v. Bayou Johnson Oyster Co., supra, wherein the title to tide water lands in St. Bernard parish was under consideration, the court reviewed the jurisprudence of the country, showing general approval of the doctrine that title to the soil under the navigable waters of each state is vested in the state by its inherent sovereignty; that "the soil beneath the great lakes and navigable waters, above as well as below the flow of the tide, properly belongs to the states, by their inherent sovereignty."

In State v. Capdevelle, supra, involving Lakes Rond, Fausse Pointe, Dauterive, and Little Lake Long, which are nothing more than widened parts of the Atchafalaya river, the court held that the lake beds belonged to the state by virtue of its inherent sovereignty. In the course of the opinion, the rule was announced that: "Once a body of water is found to be navigable, it follows that the bed or bottom must be held to be the property of the state."

In State v. Bozeman, supra, which is referred to in the majority opinion, the extent of the area of the bed of Cross Lake in 1812 was only incidental to the pivotal question of the navigability, vel non, of the lake at that time. The state's title depended solely upon its ability to establish that Cross Lake was a navigable body of water in 1812, the date of the state's admission into the Union.

When this was established, it necessarily followed that the title of the state to the bed of the lake was recognized to the only established ordinary high-water mark.

Article 450 of the Civil Code provides that:

"Things, which are common, are those the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended them; such as air, running water, the sea and its shores."

Article 453 of the Civil Code provides that:

"Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water."

Hence there can be no such thing in this state as private ownership of the bed of a navigable river, and a fortiori can there be no such thing as private ownership of the bed of a navigable lake. Cf. La. Navigation Co. v. Oyster Commission, supra, at page 754 of 125 La., 51 So. 706.

In my opinion, the title of the state to the bed of a navigable lake cannot be partly original and partly derivative, as is suggested in the majority opinion. It is always an original title. The right to the ownership of the soil in navigable waters inheres in the state in its sovereign capacity. It is impossible for me to differentiate that portion of the bed of the lake which is due to erosion from that part which is not. When the erosion occurs, the submerged area due thereto becomes incorporated into the bed of the lake, and is the property of the state.

The earliest case in our jurisprudence on this question is Milne v. Girodeau, 12 La. 324.

The opinion is very brief, as if its author felt it was unnecessary to discuss the question. The opinion, however, sufficiently shows the facts on which the decision was predicated; namely, that the plaintiff could not recover in a petitory action, when it was shown the property claimed lay below the high-water mark and formed part of the bed of the lake; that land thus situated is not susceptible of private ownership. Counsel for plaintiff state in their brief that they have examined the original record in this court as well as in the district court, where all the data and the testimony are preserved, which set forth in full all the facts. They set out in their brief, no doubt correctly, the facts as they found them in the record, viz.:

"The plaintiff, Milne, through mesne conveyances originating from a French grant in 1764, was the owner of a large piece of property on the shores of Lake Pontchartrain. At the time the grant was made the land extended much further into Lake Pontchartrain than was true at the time this controversy arose.

"In 1831 Milne conceived the idea of laying out a townsite or village upon this property, and for that purpose he had a plat thereof made, with streets and squares shown thereon extending to the water's edge. He, moreover, depicted upon this plat lots and squares in the bed of Lake Pontchartrain, itself, to the point where the original line of the property had extended at the time of its acquisition from the French Government, and he then proceeded to sell lots, and sold quite a good many.

"In 1833, or thereabouts, the defendant erected upon one of these lots, which was out in the water, a house, and after Milne had tried in vain to make him desist, this petitory action was filed. Milne claimed to be the owner of this lot upon which the house

was built and asked that the defendant be ousted therefrom and enjoined from further interfering with his possession. The defense was that this property then constituted the bed of Lake Pontchartrain and was therefore incapable of private ownership.

"The judge of the district court held that the lot in dispute constituted part of the bed of the lake, was not susceptible of private ownership even by the proprietor of the lake shore, and rejected plaintiff's demand."

This court affirmed the judgment, saying: "It appears to us that the testimony shows fully, the ground in question, lies much below high water mark, and forms part of the bed of the lake, and is not, therefore, susceptible of private ownership."

The case of Zeller v. Yacht Club, 34 La. Ann. 837, was to the same effect as the decision in Milne v. Girodeau. And both these cases were impliedly, if not expressly, approved by this court in La. Navigation Co. v. Oyster Commission, supra.

The Court of Appeals for the parish of Orleans also seems to have considered the question to be too well settled to require much comment, as will appear from its decision in Roussel v. Grant, 14 Orleans App. pages 57, 59. There, plaintiff sought to recover a tract of land bordering on Lake Pontchartrain, basing his claim on a complete Spanish grant. Defendant claimed under a grant from the Secretary of War, and pleaded that plaintiff sought to recover a part of the waters of the lake. The court, speaking through Judge St. Paul, now one of the Associate Justices of this court, said:

"We fail to see what bearing this can have on the controversy. It is a matter of public knowledge that the waters of Lake Pontchartrain have constantly gained upon the shore at this point, during the last one hundred and fifty years. And doubtless the grant to plaintiff's ancestor contained more land than is found there at present.

"But since land below the low water mark is not susceptible of private ownership, it is purely a moot question, and of no practical importance for us to inquire whether or not plaintiff's lots once extended beyond the present shore line. Plaintiff is clearly entitled to all the land up to the present low water mark; and if the actual measurement now given extends beyond the old low water mark plaintiff takes nothing by this judgment beyond that mark."

The latest expression of this court on the question is to be found in N. O. Land Co. v. Board of Commissioners, 171 La. 718, 132 So. 121, decided December 1, 1930, where it was held that the bed of Lake Pontchartrain lying below the ordinary high-water mark was the property of the state, and therefore insusceptible of private ownership.

Our own jurisprudence on the point is in accord with the views of the French legalists and are supported by the decisions of courts of last resort in other states.

The rule in France is stated by Fuzier-Herman in his Code Civil Annote, vol. 1, art. 538, p. 687, n. 193, as follows, viz.:

"The adjacent lands which become definitely invaded by the tides should be considered as shores of the sea and as belonging by virtue of this title to the Domain."

And in Dalloz (Repertoire, vol. 17, p. 359, Domaine Public, No. 32) as follows, viz.:

"If as has been decided, and the decision is but an exact although rigorous application of the principles of the matter, that the land of a private owner bordering on the sea becomes seashore and, therefore, a dependence of the public domain whenever it is invaded in a permanent manner by the high tide of March; in consequence the dispossessed own-

er no longer retains any right to the natural products of the land."

See, also, to the same effect C. de Douai, 10 Janv., 1842; Fuzier-Herman, Code Civil Annote, vol. 1, p. 687, No. 199.

In Jefferis v. East Omaha Land Co., 134 U. S. 178, 196, 10 S. Ct. 518, 33 L. Ed. 872, the Supreme Court of the United States recognized the fact that a water line, which is a shifting line and may gradually and imperceptibly change, is just as fixed a boundary in the eye of the law as a permanent object, such as a street or wall. And the court approved the view that, where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary of the lot.

Hume v. Rogue River Packing Co., 51 Or. 237, 83 P. 391, 92 P. 1065, 96 P. 865, 31 L. R. A. (N. S.) 396, 131 Am. St. Rep. 732, was a case involving a claim of an exclusive right to fish in tide waters at the mouth of a river. Plaintiff urged that he owned the land in dispute under his acquisition from the state of the tide lands bordering on the river as well as all the adjacent uplands. He asserted ownership to the bed of the mouth of the river, because of the shifting of the channel, and it appeared his titles embraced the river's mouth. The court held: "When that part of the shore to which plaintiff claimed title as tide land, by deed from the state, became submerged by the gradual shifting of the river, he lost all title thereto and it became invested in the state."

In Trustees v. Kirk, 84 N. Y. 215, 38 Am. Rep. 505, the court held that a grant of land to a cliff, where a municipality retained a strip between the sea and the cliff, did not carry to the shore line, and, when the sea encroached, the city lost its land entirely. The court said, among other things: "They [the municipality] would be entitled to what-

ever should be gained from the sea by alluvion or dereliction, and their title was liable to be lost by the advance of high-water mark, so as to bring the strip reserved within the ebb and flow of the tide."

I think the legal principles announced in the foregoing authorities are applicable to the present issue, for, in my opinion, there can be and is no legal distinction between the beds of any navigable bodies of water, whether they be bodies of salt or fresh water.

It appears to be a rule of property in this state that the sovereign is vested with title to the beds of all navigable bodies of water, and that the riparian proprietors hold their titles subject to the rule. State v. Richardson, 140 La. 329, 72 So. 984; Wemple v. Eastham, 150 La. 247, 90 So. 637. But, in any event, the fundamental rights of the state as the sovereign to the ownership of the beds of all its navigable waters must be read into the titles of all lands bordering on such waters. When the defendants acquired their lands from the state, they took them burdened with the condition that, whenever any part of the lands became submerged by the gradual erosive action of the elements, they would lose all title thereto, and it would become revested in the state.

Articles 509 and 510 of the Civil Code, referred to in the majority opinion, I respectfully submit were enacted by the state to regulate the private rights of the owners of lands situated opposite each other on the banks of rivers or streams, whether navigable or not. They cannot, in the very nature of things, be construed so as to impliedly divest the state of property which it owns in its sovereign capaciy. Moreover, if any statutory authority is required to support the state's ownership of such property, articles 450 and 453 of the Civil Code, hereinabove referred to and quoted, are sufficient for that purpose.

Even under the French Civil Code, articles 556 and 557 of which are similar to articles 509 and 510 of our Civil Code, and which contains the additional article 558, the law writers make a distinction between private lakes and public lakes. In the former class under article 558 alluvion does not take place. Thus Demolombe (Code Napoleon, t. 10, Distinction des Biens, liv. 2, p. 23, n. 25) says: "According to the terms of Article 558: Alluvion does not take place in case of lakes or ponds. * * * The reason for this is, on the one hand, that there is no longer question of running water, but of a body of immobile water, enclosed and contained, by its very nature or by its destination within limits invariably fixed."

See to the same effect Dalloz, Nouveau Code Civil, p. 922, n. 1, sub-art. 558; Aubry et Rau, Droit Civil Francaise, t. 2, p. 384, n. 203; Fuzier-Herman, Repertoire du Droit Francaise, t. 25, p. 783, n. 10, sub. Lac; Laurent, Cours de Droit Civil, t. 1, p. 499, n. 543.

The lakes with which the French authorities were dealing in their commentaries were lakes that were dormant and incapable of extending themselves. Necessarily the question of alluvion or reliction could not arise in connection with that particular class of lakes. But the same commentators recognized that different legal principles applied to lakes in which the waters are not immobile. Thus Fuzier-Herman (Repertoire du Droit Francaise, t. 4, p. 57, sub. Alluvion, nos. 47 et 48) states the rule to be:

"This article (article 558) does not cease to be applicable though the lake be traversed by a river or a stream from which it is fed if the captive waters are held bound by the natural condition of the place by dams or other works executed by the hand of man. Ph. Dupin, Encycl. du. dr., sub. Alluvion, n. 20.

"But it is different in case of lakes and ponds in which the waters have a certain movement, such as lakes and ponds which communicate with the sea. In these bodies of water which are not immobile, Article 558 is inapplicable and alluvions can be created. * * * "

Larousse in his Dictionnaire Universel classifies among public lakes forming part of the public domain "the lakes Superior, Michigan, Erie and Ontario on the St. Lawrence, which all four have nearly one-seventh the surface of the Mediterranean Sea."

In Dictionnaire Generale du Notariat et du Droit Civil Moderne, t. 4, p. 350, sub. Lac, appears the following comment, viz.:

" * * * Alluvion takes place neither actively nor passively in lakes and ponds; that is to say, they preserve always their limits, and neither give nor remove anything in the case of their owners, as well as in the case of their neighbors by their increase or diminution. L. I, #3, D. ut in flum publ.

"Nevertheless, it is otherwise in the case of public lakes which the authors assimilate to public rivers. Cepola, de servit, proed. rust. Cap. 30, n. 6. Malleville, sur l'art. 538 Civ. Cappeau, ibid."

Certainly Calcasieu Lake is not a dormant body of water of which the boundary is invariably fixed. On the contrary, it is indisputable that it is a body of water in which there is, and always has been, a certain well-defined movement of its waters and a constant and well-marked enlargement of its bed. In this respect Calcasieu Lake cannot be differentiated from, but must be assimilated to, rivers and other running streams.

The cases of Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 So. 806, and Bank of Coushatta v. Yarborough, 139 La. 510, 71 So. 784, are referred to in the majority opinion.

With all due respect, I suggest that the cases have no application to the issues involved here. In both cases the court was considering the dried lake bottoms in the dried lakes of the northern part of the state. In neither case was there any question involved of a permanent submergence of the soil due to natural causes. These lakes were what might be termed "barrier lakes." Their waters receded when the barrier which caused their formation was removed. This barrier was the great raft which had formed in Red river. The court held that the rule of dereliction set forth in Civ. Code, art. 510, was not applicable only because the recession of the waters was due to the act of man (the removal of the raft and the construction of levees), and not to the action of natural forces.

For these reasons, I respectfully dissent from the majority opinion and decree herein.

On Rehearing.
ODOM, J.

The pertinent facts and questions of law involved in this suit are set forth in full in our original opinion and also in the dissenting opinion of Justice Rogers, and it is unnecessary to restate them here.

The members of the court have from the beginning concurred in the view that the body of water lying in Calcasieu and Cameron parishes, referred to as ·Calcasieu Lake, should be regarded as a lake and not as a river. But some of the members of the court did not subscribe to the view expressed in the majority opinion that articles 509 and 510 of the Civil Code with reference to accretion and dereliction do not apply to lakes, but only to navigable rivers or bodies of running water. In the majority opinion we said: "Our conclusion is that these articles do not apply to lakes." Three of the justices dissented from that holding; the re-

hearing was granted, not because of any doubt in the minds of those who subscribed to the majority opinion that such holding is correct, but in order to reconsider the question whether Calcasieu Lake is an arm or part of the sea.

If in fact it is, the lands involved are not susceptible of private ownership; they belong to nobody in particular; they fall into the class of public things, "the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation." Civ. Code, arts. 450, 453.

■ We have with care and great interest read the most able and exhaustive briefs submitted by counsel for the state and other appellants. We have read the decisions of our own court and those of other jurisdictions cited in support of the contention made and those cited in support of the contrary view, and, after reading them, are thoroughly convinced that under the facts and conditions shown to exist in this case Calcasieu Lake is not an arm or part of the sea. So convinced, and adhering to our previous holding that articles 509 and 510 of the Code do not apply to lakes, it follows that our former decree must be reinstated.

We said in our former opinion:

"The lake is affected more or less by the tides, especially at the southern end, up .to which point they frequently flow. As a whole, its waters are usually fresh, though sometimes they are brackish, and occasionally, due to weather conditions, are quite salt."

Counsel say that, these being the admitted facts, it follows that this lake is an arm or part of the sea. Not so under our holding in the cases of Buras v. Salinovich, 154·La. 495, 97 So. 748, 750, and Morgan v. Nagodish, 40 La. Ann. 246, 3 So. 636, 640.

In the Buras Case it was held that the fact that land "is subject to tidal overflow does

not characterize the land as 'seashore,' under the provisions of the Code. * * * It has never heretofore been supposed that the definition in article 451 of the Civil Code was intended to include in the term 'that space of land over which the waters of the sea spread in the highest water during the winter season,' any and all land that is subject to tidal overflow, however remote from the 'seashore,' as it is generally understood. The waters of the Gulf of Mexico, or the bays or coves behind plaintiff's land, do not 'spread' upon it, during the ordinary high tides, or in the highwater seasons. The tide waters back up into the coves behind the land, and cause the bayous in the land to rise and spread over most of the area. *These expressions in the Code 'the sea and its shores,' and 'seashore,' have reference to the Gulf coast, and to the lakes, bays and sounds along the coast.*" (Italics ours.)

The court then quoted approvingly the following from Morgan v. Nagodish, supra:

"If the salt water ascertained to be in a bayou, lake, cove, or inlet adjacent to, or connected with, an arm of the Gulf of Mexico, does not result from an overflow that is occasioned by high tides flooding its banks, but, in the first instance, enters an arm of the Gulf, and thence passes into said bayou, lake, etc.. and is there combined with fresh water derived from other sources, same cannot be considered as an arm of the sea, nor its banks the seashore.

"All the tract of land over which the greatest water flood extends itself is the seashore.

" '*High seas*' *mean that portion of the sea which washes the open coast, and do not include the combined salt and fresh waters which, at high tide, flood the banks of an adjacent bay, bayou, or lake.*"—citing Waring et al. v. Clarke, 5 How. 453, 12 L. Ed. 226. (Italics ours.)

In the Morgan v. Nagodish Case, the organ of the court quoted Justinian and our Civil Code, and concluded that: "Whether we take the criterion established by our Code, or that by Justinian, and apply to either the evidence in this case, we must conclude that Bayou Cook is not an arm of the Gulf of Mexico, and that its banks form no part of the seashore. The salt water ascertained to be in Bayou Cook is not supplied by a 'water-flood' from the gulf; nor do 'the waters of the sea (gulf) spread, in the highest water, during the winter season,' over its banks."

As to whether Calcasieu Lake is an arm of the sea, these cases are directly in point and are decisive.

Counsel direct our attention to the case of New Orleans Land Co. v. Board of Levee Commissioners, 171 La. 718, 132 So. 121. That case involved a tract of land bordering on Lake Pontchartrain, which is an arm of the sea (Milne v. Girodeaux, 12 La. 324; Zeller v. Yacht Club, 34 La. Ann. 839; and Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249), so that the ruling in that case is not controlling here.

It is therefore ordered and decreed that our former opinion be reinstated and made the final judgment of the court.

ROGERS, J., dissents, adhering to the views expressed in his dissenting opinion on the original hearing.

BRUNOT and ST. PAUL, JJ., dissent.