248 So.2d 813

Orlando B. CARTER et al., Plaintiffs-
Appellants-Respondents,

v.

Ellen Bryan MOORE, Register of State Land
Office, State of Louisiana et al., De-
fendants-Appellees-Relators.

No. 50684.

May 4, 1971.

Rehearing Denied June 7, 1971.

Adam G. Nunez, Lake Charles, for plaintiffs-appellants-respondents.

Jack P. F. Gremillion, Atty. Gen., Edward M. Carmouche, A. J. Bonfanti, John L. Madden, Asst. Attys. Gen., Charles Romano, Sp. Asst. Atty. Gen., for defendants-appellees.

TATE, Justice.

The issue in this suit is whether state officials may be compelled by mandamus to issue a patent with an ambiguous description. The claim arises because of a clerical error at the time of the issuance of an original patent in 1881, since corrected. We hold that Act 62 of 1912 (La.R.S. 9:-5661), preventing annulment of patents in certain instances, does not here apply so as to require the re-issuance of an original patent, since corrected, which contained an ambiguous or void description.

The heirs and successors in title to Vile or Theriot file this mandamus suit against the Register of State Lands and the Governor of Louisiana. The plaintiffs seek to compel the issuance of a new corrective patent recognizing them as owners of a certain governmental half-section. The trial court dismissed the suit. The court of appeal reversed. 234 So.2d 823 (La. App. 1 Cir., 1970). The proceeding is before us upon writ of review granted the defendant state officials. 256 La. 613, 237 So.2d 396 (1970).

The plaintiff's claim is based upon the issuance in 1881 to Theriot, their ancestor in title, of a state patent to certain lands, including the "f1 [*fractional*] S² Sec. 21". (If Section 21 were a normal 640-acre governmental division, the south half would be situated entirely in Grand Lake, which is a navigable body of water, normally inalienable. Miami Corporation v. State, 1936, 186 La. 784, 173 So. 315.)

In 1962, at the behest of one of the plaintiffs a new patent was issued "in correction of" the 1881 patent—and this substituted land described in the "Fractional North Half" of the section (instead of in the "*fractional* south half"). The intent of the present suit, filed in 1963, is to void this 1962 correction.

The court of appeal granted plaintiffs the relief requested. It declared void the 1962 patent issued in correction of the 1881 one. It held the state was barred from making any change in the description of the 1881 patent by Act 62 of 1912 (La.R.S. 9:5661). This enactment prohibits the State, after a specified period, from annulling previously issued patents. See California Company v. Price, 225 La. 706, 74 So.2d 1 (1954).

We granted certiorari primarily because we felt that the majority of the court of

appeal had incorrectly found the 1912 act and *Price* applicable.[1]

The uncontradicted facts show the following:

The 1851 official government survey of the township[2] showed certain "fractional sections", "fractional half-sections" and "fractional quarters" on the shores of Grand Lake.[3] These included "Fractional Section 21", consisting of 45 acres of swamp lands.

In 1881, Theriot (the plaintiffs' ancestor) formally applied for 330 acres of sea marsh lands in the township. These included "fl [fractional] Sec. 21", described as containing 45 acres. The quantities shown for each of the other fractional divisions applied for likewise corresponded with the government survey, as did the 330-acre total of the land applied for.

Pursuant to this application, Theriot was issued on June 30, 1881 a patent to 330 acres in the township in question. These were described by governmental survey designation and as containing 330 acres "according to the official plat of the survey of said lands." Each of the fractional divisions was shown just as applied for, *except* that through clerical error the "fl sec. 21" applied for was shown on the patent as the "fl $S^2$ sec 21."

Despite this clerical error, the unmistakable intent was to issue a patent to the governmental division shown by the official survey as "Fractional Section 21" (i. e., not any fractional south half thereof) and as containing 45 acres. This surveyed section was contiguous to the other fractional sections patented, it was so described in the application for the patent, and the acreage of the other fractional divisions patented totalled 285 according to the official plat (so that, adding 45 acres for Section 21 lands, it totalled the 330 acres described as patented).

So far as the record reflects, this clerical error was not discovered until 1962. Then one of the co-owners visited the state land office and noticed that the Sec-

1. This was the state's initial position. However, at the oral argument one or more of the justices sua sponte suggested that *Price's* interpretation of the 1912 statute was erroneous and should be overruled. Briefs were requested as to this question. Nevertheless, in the view of a majority, our determination of a threshold issue concerning the specific demand before us makes unnecessary for decision any consideration at this time of the correctness of the *Price* decision.

2. T 13 S, R. 4 West, Louisiana Meridian, per survey of May, 1851 by John Boyd, Deputy Surveyor, approved by R. W. Boyd, Surveyor General on February 28, 1952. See also Official State Plat, approved May 28, 1952, per (re) survey in accordance with Act 232 of 1934.

3. That is, containing less than 640, 320, or 160 acres, respectively. See Patton on Titles, Section 116 at p. 293 (2d ed. 1957): "Where reservations, navigable lakes, streams, etc., intercept the surveys, they produce fractional divisions, known as fractional sections, fractional quarters, etc." See also 43 U.S.C. § 751(5).

tion 21 description of the patent referred (or so he and the staff thought) to an unsurveyed portion of Grand Lake. He secured the issuance of a patent issued in correction of the earlier 1881 one, now showing the Section 21 land patented as in the "North Half". The obvious intent was to show the land patented as on the shore of Grand Lake, pursuant to the intent of the original application, rather than out in the bed of it.[4]

In 1963, the plaintiffs filed this mandamus suit. The specific prayer is for an order compelling issuance of a new corrective patent recognizing them as owners of "the South half (S ½) of Section 21, Township 13 South, Range 4 West." (We will hereinafter omit township and range identification of Section 21.)

Initially, we must observe there is no warrant whatsoever for the plaintiffs to receive a patent to the entire "South Half" of Section 21. At most, their claim is to receive a patent to the *fractional* south half, if indeed they are entitled to have perpetuated the clerical error of the 1881 patent.

However, they are not entitled even to this latter relief. As will be seen, such original description is ambiguous, if not

void. The defendant officials are not required to reinstate it.

The only governmental survey subdivision pertaining to the area at issue is "Fractional Section 21", containing the 45 acres of overflow lands adjacent to Grand Lake. A government survey *creates*, not merely identifies, the township sections and the boundaries thereof. Cox v. Hart, 260 U.S. 427, 43 S.Ct. 154, 67 L.Ed. 332 (1922); United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599 (1916); Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68 (1895); State v. Aucoin, 206 La. 787, 20 So.2d 136, 142–143 (1944); Union Producing Company v. Placid Oil Co., 178 So.2d 392 (La.App. 1st Cir. 1965), cert. denied 248 La. 447, 179 So.2d 432 (1965).

A "fractional section" has a recognized and specific meaning. It signifies that, in the official survey, the exterior boundary lines do not within them contain the normal 640-acre area because a portion of the section has been cut off by some obstruction, such as a navigable body of water or overlapping prior survey—that the government surveyor was prevented from making a regular section by some such obstruction. Horne v. Smith, 159 U.S. 40, 15 S.Ct. 988 (1895); Gazzam v. Lessee of

---

4. According to the official survey, "Fractional Section 21" consisted of a triangular tract of 45 acres of swamp or overflow lands. The north and west boundaries were the section lines, and the meander line of Grand Lake formed its third or southeasterly side. In short, the area of Fractional Section 21 was situated in what would be the northwesterly corner of a full 640-acre section—if the section lines had been extended into the lake, which they were not.

Phillips, 20 How. 372, 15 L.Ed. 958 (1958); State v. Aucoin, 206 La. 787, 20 So.2d 136, 142–143 (1944); Gilmore v. Lyon Lumber Co., 159 La. 18, 105 So. 85 (1925); Patton on Titles, Section 116 (2d ed. 1957); Black's Law Dictionary, verbo "Fractional", p. 786 (4th ed. 1951); 17 Words & Phrases, verbo "Fractional", "Fractional Section", pp. 684–685 (1958 ed.).

Therefore, with regard to the original 1881 patent, the description of a certain area as the "fractional south half of Section 21" was at least ambiguous. The only governmental survey subdivision ever created was "Fractional Section 21"; no official survey has created any "south half" of this 45-acre section, let alone any "fractional south half." [5]

In claiming the south half of Section 21 (which they contend consists of 320 acres out in Grand Lake), the plaintiffs contend that such governmental half-section can be ascertained by extending the lines of Fractional Section 21 and completing the section so as to include the normal 640 acres.

They rely on Realty Operators v. State Mineral Board, 202 La. 398, 12 So.2d 198 (1942) and State v. Bozeman, 156 La. 635, 101 So. 4 (1924).

The decisions relied upon are not apposite to the present issue. In *Realty Operators*, the patentees received title to swamplands unambiguously described (the area containing in fact 640 acres, per the patent's description) as full regular sections, in which was situated a small lake. The court specifically differentiated the government survey there in question from that involved here and in McDade v. Bossier Levee Board, 109 La. 625, 33 So. 628 (1902), where the official plat of survey shows the lake bed and fractional sections and discloses an express intent to patent only the fractional sections on the shore. See 12 So.2d 202. *Bozeman* simply referred to a description of Cross Lake in terms of such imaginary government sections, in a conveyance from state to city, in holding that a petition by state and city for recognition of their ownership of the Lake stated a cause of action.[6]

5. The only patentable "south-half" of Section 21, per government description, might be the informal designation as such of the south half of the 45 acres of the "Fractional Section 21" created by government survey.

6. Since we are unable to agree with the plaintiff's contention that there is any governmental subdivision denoted as "the south half of Section 21", we do not reach the issue of what property might be received through a title to a non-existent

"*fractional* south half", or of the possible nullity for uncertainty of such a description: i. e., *Which* fractional portion (or 45 acres) was intended? See: Civil Code Article 2275; Lemoine v. Lacour, 213 La. 109, 34 So.2d 392 (1948) and Tircuit v. Burton-Swartz Cypress Co., 162 La. 319, 110 So. 489 (1926) and jurisprudence therein cited; Patton on Titles, Section 80 at 262–64 (2d ed., 1957); 26 CJS Deeds §§ 29, also 30 (at footnote 52).

Thus, in light of these factual and legal conclusions, the precise issue before us is this: Where an original patent had contained an erroneous and ambiguous description, and this had subsequently been corrected at the instance of a successor to the patentee, does mandamus now lie to compel state officials to issue a new corrective patent reinstating the original ambiguous (and erroneous) description?

Relief by mandamus is available to compel performance by a public officer "of a ministerial duty required by law." La. CCP Art. 3863. The plaintiffs insist that the defendant officers are under such a ministerial duty. They contend that the extrajudicial correction, in 1962, of the 1881 patent had the effect of annulling it, insofar as (they claim) it conferred title to them of 320 acres of Grand Lake situated in the South Half of Section 21.

Such action they contend, is forbidden by Act 62 of 1912 (La.R.S. 9:5661), as interpreted by California Company v. Price, 225 La. 706, 74 So.2d 1 (1954). The statute forbids the annulment of state patents, duly issued and recorded, after six years following the date of issuance. The plaintiffs argue that, by virtue thereof, the State was without authority to change the description set forth by the 1881 patent.

This statute is not here applicable. For reasons previously set forth, the 1881 patent did not describe any portion of the bed of Grand Lake. It did not describe any governmental subdivision, for there was (and is) no "south half" of Section 21, nor any "fractional south half" thereof; there is only a "Fractional Section 21", containing 45 acres of overflow lands.

The description of the land patented as being in the non-existent "fractional south half" of Section 21 was ambiguous, if not void. Therefore, Act 62 of 1912 (La.R.S. 9:5661) did not bar an otherwise timely suit by the State to secure correction of the ambiguous or void description: The demand and object of such an action is to effectuate a patent, not to annul it. Cf., State v. Aucoin, 206 La. 787, 20 So.2d 136 (1944) (Syllabus 3). The object is to carry out the mutual intention of the parties as to the description of the area patented, not to take away any area actually described by it.

As issued in 1881, the patent described *no* area with regard to Section 21, or at least no area ascertainable without the aid of extrinsic evidence. It did not conceivably describe any portion of Grand Lake now sought; for the plaintiffs' claim by the 1881 patent to any portion of Section 21 can concern only "Fractional Section 21", the only relevant survey section created in the township—and *this* section is limited in area to its 45 acres of sea marsh or swamp lands on the shores of Grand Lake.

In 1962, at the instance of a successor of the patentee, the ambiguous or void

description of the 1881 patent had been corrected to reflect the area patented, in accordance with the actual intent of the original parties as indisputably shown. The rights of no innocent third persons were affected.

We are cited to no authority by which, under the cited circumstances, the defendant public officers must now replace the 1962 corrected patent, with yet a third patent reinstating the ambiguous and erroneous description of the original 1881 patent.

For the reasons assigned, therefore, the judgment of the court of appeal is reversed, and we reinstate and affirm the trial court judgment dismissing the plaintiffs' suit. The plaintiffs are to pay all costs of these proceedings.

Court of appeal reversed, and trial court judgment reinstated.

SUMMERS, J., concurs. In my view plaintiff remains as the owner of the 45 acres constituting Fractional Section 21, Township 13 South, Range 4 West on the banks of Grand Lake, which is all he received in the original patent.

BARHAM, J., concurs with written reasons.

BARHAM, Justice (concurring in the result).

The Court of Appeal in this case based its decision upon California Company v. Price, 225 La. 706, 74 So.2d 1 (1954), and State v. Cenac, 132 So.2d 897 (La.App. 1st Cir. 1961), writs refused 241 La. 1055, 132 So.2d 928 (1961). See 234 So.2d 823 (La.App. 1st Cir. 1970). A strong dissent in the Court of Appeal relied upon an act of the Legislature in 1954, which had never been passed upon, as authority for overruling California Company v. Price. We granted writs with a view of reconsidering the Price and Cenac decisions and considering the act of the Legislature as they might affect patents covering bottoms of navigable waters. Instead of disposing of this fundamental, important, and pressing problem, however, the majority has found a minor issue upon which to base its judgment in this matter. I take no point with this determination. Nevertheless, here we are faced directly with a point of law which is unsettled, which vitally affects the interests of many potential litigants including the State, and involves considerable sums of money. It is my opinion that we should resolve that major issue rather than pretermit it. For this reason I am compelled to concur.

The plaintiffs' ancestor in title, Vileor Theriot, applied for and received a patent to 330 acres of land in 1881. Included in the 330 acres was the fractional $S\frac{1}{2}$ of Section 21, with indication that it contained 45 acres and was located in T. 13 S., R. 4 W. This sale would be one of those authorized under Section 11 of Act

No. 75 of 1880, which repealed and re-enacted Act No. 247 of 1855. The sales authorized by these acts were of lands acquired by grant from the federal government of swamp and overflow lands under Acts of Congress of 1849 and 1850.

One of the successors in title, realizing that if there was a fractional S½ of Section 21, it was in Grand Lake, a large navigable body of water (and not an acquisition by the State under the Acts of Congress of 1849 and 1850), had the State Land Office make a correction of the patent in 1962 so as to describe the particular 45 acres as being the fractional N½ of Section 21. This successor in title, Mr. Nunez, the attorney who represented himself and the other plaintiffs before us, later tried unsuccessfully to have the corrected patent changed back to show its original description. Finally, after gaining permission to sue the State, the successors in title have brought suit for mandamus to compel defendants to correct the corrected patent and thus, in effect, recognize plaintiffs as owners of the S½ of Section 21, which if it exists, lies under the navigable waters of Grand Lake.

We are directly faced with a problem which was presented in California Company v. Price, supra (on first hearing December, 1953; on rehearing May, 1954), in which a divided court held that Act No. 62 of 1912 was such an act of limitation, prescription, or peremption as to repose title in those who held grants of beds of navigable waters made prior to 1921, if the State had not brought suit to annul the grants within the six years afforded by the act.[1] (The Constitution of 1921 forbids alienation of the beds of navigable waters.) Immediately after Price, the Legislature, as if in response to the majority's prodding,[2] enacted Act 727 of 1954 which states in the first section the intent of the Legislature in 1912 to be contrary to the holding in Price, and states in the second section that all grants of bottoms of navigable waters, theretofore or thereafter made, are null and void. This court has not spoken upon this problem since that time. In 1961 the First Circuit Court of Appeal decided State v. Cenac, supra, which followed California Company v. Price without reference to the 1954 act. This court refused writs in Cenac, with Mr. Justice Hawthorne, Mr.

---

1. Mr. Justice Hamiter wrote the original opinion. On rehearing Mr. Justice McCaleb wrote for the majority, Mr. Justice LeBlanc concurred, and Chief Justice Fournet, Mr. Justice Ponder, and Mr. Justice Hawthorne dissented. As noted elsewhere in this concurrence, there are six written opinions in the Price case.

2. In California Company v. Price, 225 La. 706, 74 So.2d 1, the majority said that, in the face of all these decisions, " * * * the Legislature has met many times since the first ones were rendered and apparently approved the interpretation given the statute by the court, by its failure to enact an amendatory law * * * ".

Justice Hamlin, and Mr. Justice Sanders dissenting from the refusal and assigning reasons, and with Chief Justice Fournet and Mr. Justice Summers writing concurrences. While the dissenting and concurring opinions in Cenac are interesting, they do not have the effect of decisional law.

While there have been two views offered as to whether a state should own the bottoms of navigable waters, the question is moot and was moot in Louisiana even before statehood but more certainly after statehood. All doctrine and all jurisprudence with only slight inconsistencies, even recent jurisprudence including California Company v. Price, recognize that even before the Constitution of 1921 (the Constitution only placed alienation beyond legislative authority) the bottoms of all navigable waters belonged to the State, and that it was inimical to public policy to permit private ownership. See 2 Yiannopoulos, Louisiana Civil Law Treatise, § 32; Hebert and Lazarus, Legislation Affecting the Civil Code, 15 La.L.Rev. 9, 21; Dainow, Property, 15 La.L.Rev. 273. The cases in general decide that beds of navigable waters belong to the State under one or more of the following theories: "Inherent sovereignty", acquisition through statehood in 1812, statutory legislation including the "oyster statutes", and Article 453 of our present Civil Code and its source articles.[3]

I am of the opinion that Articles 449, 450, and 453 of the Civil Code mandate the inalienability of the bottoms of navigable waters.[4] The language used in Article 453

3. Milne v. Girodeau, 12 La. 324 (1838); Louisiana Navigation Co. v. Oyster Com'n, 125 La. 740, 51 So. 706 (1910); State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405 (1912); State v. Capdeville, 146 La. 94, 83 So. 421 (1919); State v. Bozeman, 156 La. 635, 101 So. 4 (1924); State ex rel. Saint v. Timothy, 166 La. 738, 117 So. 812 (1928); New Orleans Land Co. v. Board of Levee Com'rs, 171 La. 718, 132 So. 121 (1930); Miami Corporation v. State, 186 La. 784, 173 So. 315 (1937). State v. Erwin, 173 La. 507, 138 So. 84 (1931), decided almost immediately after the New Orleans Land Co. case, supra, recognized on first hearing that Calcasieu Lake was a freshwater navigable lake belonging to the State up to the highwater mark "by virtue of its inherent sovereignty", but held that the State could not benefit by the dereliction and submergence of its banks since Civil Code Articles 509 and 510 applied only to navigable rivers and not to lakes. On rehearing the court held Calcasieu Lake not to be an arm of the sea, apparently finding a difference in the status of freshwater lakes and lakes which are arms or parts of the sea. Three justices dissented in Erwin. The Erwin decision was criticized 7 Tul.L.Rev. 438. In the Miami Corporation case Erwin was specifically overruled insofar as it differentiated between bottoms of lakes which were arms of the sea and those which were freshwater inland navigable waters. Miami held that abutting land which becomes a part of the bottom of any navigable water by dereliction vests in the State. The dissent by Chief Justice O'Niell in Miami recognized the ownership of these beds in the State but disputed the State's right to acquire additional land by erosion and submergence.

4. The pedantic argument has been that it is the water which was meant to be a com-

"of this kind are" expressly makes the things named thereafter, including "navigable rivers" and the "beds of rivers", illustrative and not limiting. It was the intent of the redactors of the Code to protect all navigable *waters*, and they believed it necessary to make the beds of these waters *public and inalienable* in order to protect the waters. Clearly the use of the term "rivers" is merely illustrative, for much of the navigation in early Louisiana required the use of lake waters, as it does also today.

The court was generally consistent about the State's ownership of the bottoms of navigable waters; the differences of opin-

ion primarily centered around the question whether the State could acquire more waterbottoms by the submergence of abutting land or lose waterbottoms by gradual subsidence of water or by accretion to abutting land. An interpretation of Civil Code Articles 509 and 510 was decisive of these cases.

My belief in the universality of opinion today that the bottoms of navigable waters in Louisiana have always been inalienable and not subject to private ownership except by express legislative authority is buttressed by the very fact that the Supreme Court of this state in five cases resorted to what has been called an act of

mon thing, and that the State need not have owned the waterbottoms to protect the waters. It is argued that the waterbottoms could have been privately owned and their use so regulated as not to interfere with the common property, the water. The contrary view has prevailed in Louisiana. Here "public" things as well as "common" things are insusceptible of private ownership. According to Yiannopoulos, Civil Code Article 449 should read: "Things [which are not susceptible of ownership] are either common or public. * * *" Civil Code Article 450 defines common things, and Article 453 defines public things. Article 481 is almost a repetition of Article 449. Article 482, which says that "among" the things insusceptible of ownership are "common" things, is illustrative and does not exclude "public" things. Article 453 reads:

"Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as

long as the same are covered with water.

"Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors."

This article includes as illustrative of public things insusceptible of private ownership not only "navigable rivers" but also "the beds of rivers". The courts have uniformly held that the beds of seas and, later, the beds of navigable rivers and lakes are insusceptible of private ownership. Several cases dealt with French and Spanish grants, which are pre-Louisiana Purchase, pre-Code, and pre-statehood. See Milne v. Girodeau, 12 La. 324 (1764 French grant), and New Orleans Land Co. v. Board of Levee Com'rs, 171 La. 718, 132 So. 121 (French and Spanish). It is at this point of little importance whether the waterbottoms be considered insusceptible of ownership by anyone including the State or only insusceptible of private ownership, because if they are so definitely common things as to be insusceptible of any ownership, they are as inalienable as if they are owned by the State for the public.

repose (Act No. 62 of 1912) to validate patents which covered waterbottoms. If waterbottoms, particularly those of navigable waters, were susceptible of private ownership and alienation, Act No. 62 of 1912 was unnecessary to settle the question of title in all of these cases since the principal question as to validity was whether title could be transferred to the beds of such waters.

As early as Act No. 247 of 1855 our Legislature recognized that if any of the lands acquired through Acts of Congress of 1849 and 1850 contained navigable waters, the land under these waters would not be subject to sale as provided in that act for swamp and overflow land. Also, Act No. 124 of 1862 recognized that the bottoms of navigable lakes were insusceptible of private ownership by providing that once the beds of the navigable lakes became dry by natural causes, they became "swamp lands" and were susceptible of alienation. See State v. Capdeville, 146 La. 94, 83 So. 421 (1919), which stated in reference to this act of 1862: " * * * it would seem clear that the body [the Legislature] did not consider the beds of lakes such as those in controversy in this case swamp lands, to be disposed of as such until they became dry." Thus the public policy of inalienability of the beds of navigable waters was twice recognized by statute even before the issuance of the patent here in contest. Additionally, prior to

Act No. 62 of 1912 there were repeated statements through legislative enactments of the public policy that waters and beds of navigable bays, lakes, and rivers should be owned by the State and were insusceptible of alienation to private interests. See "oyster statutes" beginning with Act No. 106 of 1886.

The first case to apply Act No. 62 of 1912 to patents involving waterbottoms was State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833 (1927). The court went to great lengths to distinguish between navigable and non-navigable waters, and only after a finding of *non-navigability* did the court consider other issues and apply Act No. 62 of 1912. It is difficult to believe after a thorough reading of this case that the court there would have applied the 1912 act if the lands involved had been the bottoms of *navigable waters*.

In New Orleans Land Co. v. Board of Levee Com'rs, 171 La. 718, 132 So. 121 (1931), it was held that a lake bottom was insusceptible of private ownership.

In State v. Erwin, 173 La. 507, 138 So. 84 (1931), this court, while dealing with the application of the laws of accretion and dereliction under Civil Code Articles 509 and 510, on original hearing recognized, as did the dissents, that the beds of all navigable waters are vested in the State. On rehearing the court differentiated between seas and freshwater lakes, and held that Calcasieu Lake was not an arm of the

sea but a lake to which Articles 509 and 510 did not apply.

Thereafter, in Miami Corporation v. State, 186 La. 784, 173 So. 315 (1937), the Supreme Court in dealing with the same body of water involved in the case now before us, Grand Lake, specifically overruled State v. Erwin and found after reviewing the pertinent law and jurisprudence that all navigable waters—seas, rivers, and lakes, freshwater or salt—were insusceptible of private ownership. The court did not hesitate to overrule the so-called "rule of property" of Erwin, which it considered contrary to the law as well as to the mainstream of jurisprudence. However, if we look for a so-called rule of property at this point, it must be conceded that it was established in 1937 in the Miami case that Grand Lake was a navigable water whose bed could not be alienated to private interests.

*The question for resolution here is the effect of Act No. 62 of 1912 upon patents to private interests of land covered by navigable waters—land which was by Code, statutes, and jurisprudence declared to be owned by the State and inalienable.*

The Supreme Court in three decisions and by writ refusal in one case has declared that Act No. 62 of 1912 permitted private ownership of inalienable waterbottoms because of failure of the State to sue for annulment of patents to these water-

bottoms within the six-year peremptive period.

Realty Operators v. State Mineral Board, 202 La. 398, 12 So.2d 198 (1943), held that the navigability of the waters in question was of no importance. Perhaps the reason for pretermitting the question of navigability in that case was that the waters involved were shallow, having a depth of only two to five feet. As in the O'Brien case, infra, which was to follow, these were commercially unimportant waters, and the court could have been greatly persuaded, as it was in O'Brien, by this finding. Resorting neither to codal law nor to jurisprudence and overlooking the pertinent decision of Miami Corporation, the court there found no restraint upon the State to dispose of beds of navigable waters. The court was apparently concerned only with the absence of constitutional restraint before 1921 and did not even consider codal or statutory prohibitions. The court went on to hold that Act No. 62 of 1912 would have cured patents to these waterbottoms even if they were insusceptible of private ownership. The first error of that case was the failure of the court to examine the Code, statutory law, and the jurisprudence which should have been applied and which would have been determinative of the issue of inalienability of the beds of such navigable waters. Its second error was its reliance (in dictum) upon Sweet Lake, which was not authority

for holding that the act could validate patents which were prohibited by public policy under the Code as well as under other law and jurisprudence.

O'Brien v. State Mineral Board, 209 La. 266, 24 So.2d 470 (1945), did not apply itself to this broad principle announced in Realty Operators but stated that the Sweet Lake, Realty Operators, and its own holdings were limited to patents issued *"to unimportant lake and stream beds"*. It then applied Act No. 62 of 1912 to prescribe the action which sought to test a patent to some small and commercially unimportant lakes and bayous. I do not consider the ratio decidendi of O'Brien to address itself to the bottoms of navigable waters.

For a discussion of the evolution and limited application of Sweet Lake, Realty Operators, and O'Brien, see the dissent of Mr. Justice Hawthorne in California Company v. Price. See also 30 Tul.L.Rev. 115, 123; 14 La.L.Rev. *267, 271.*

In Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839 (1953), the author of this court's opinion in the Realty Operators case in a very brief opinion said that Duck Lake, the bed of which was there involved, was a navigable body of water, but that "By an unbroken line of jurisprudence, this Court has held that the failure of the State to institute suit to annul a patent * * * within six

years from its date * * * thereafter renders the title unassailable". The court cited Sweet Lake, Realty Operators, and O'Brien, which have been discussed above. Again, the codal, statutory, and jurisprudential prohibitions against alienation of these waterbottoms were not discussed.

In California Company v. Price, the author of the majority opinion, contrary to the approach used in Realty Operators and Humble Oil, both of which he also authored, went to the Civil Code to ascertain whether there was any prohibition against alienation of waterbottoms. The majority then erroneously discarded Civil Code Article 453, which must be read with the preceding Articles 449 and 450, and resorted to Article 482, which could not, alone and out of context, dispose of the question. Moreover, the majority completely misconstrued Article 482 and its purpose and function by attempting to place the beds of navigable lakes and rivers under the second paragraph of the article. This is a total misapplication of that article of the Code. However, immediately after the discussion of the Code articles the majority in Price said: " * * * Hence, as stated in the Miami decision, the bottoms or beds of navigable waters are *public things* within the contemplation of our Civil Code [public things are defined by Civil Code Article 453] and it is contrary to the policy expressed therein to *permit private*

*interests to own them.''*[5] Immediately following this correct statement of law, the majority posed the identical question posed here: "Let us then consider whether that doctrine [law and public policy against alienability] has been abrogated by the decision in the instant matter." (The decision had applied Act No. 62 of 1912 to prescribe or perempt the action.) That case then stated: "Act No. 62 of 1912 * * * provides '* * * That *all suits or proceedings* of the State * * * to vacate and annul *any patent* issued by the State * * * duly signed by the Governor of the State and the Register of the State Land Office, and of record in the State Land Office * * * shall be brought within six years * * *'. (Italics ours.) Thus, the statute, by its explicit and unequivocal terms, bars *all* suits to annul *any* patent, irrespective of whether the patent covers high land or submerged land."

Legislative acts should be read so as to give meaning and import to all of them and to the full expression in all of them if possible. We should not read into one statute an intent to repeal, annul, or abrogate another or others unless it expressly provides for repeal, nullity, or abrogation, or unless the statutes are incompatible. Moreover, the Civil Code is generally given preference over simple legislative acts.

The majority in California Company v. Price stated that there were numerous public policy statements on the inalienability of the bottoms of navigable waters, citing Acts Nos. 106 of 1886, 52 of 1904, 189 of 1910, 258 of 1910 (predating Act No. 62 of 1912) and further citing Acts Nos. 54 of 1914, 139 of 1924, and 67 of 1932, R.S. 56:-421 et seq. The majority stated: " * * * The Legislature of 1912 was intimately acquainted with the *public policy* of the State to retain title to all navigable water bottoms." Since we must accord to the Legislature the knowledge of its own strong public policy against alienation of these lands, we must conclude its intent, expressed in general terms, was to provide for validation of only those patents which had some lawful sanction and not patents to lands insusceptible of alienation.

In 21 Tul.L.Rev. 454 at p. 473 it is said: " * * * It is doubtful that Act 62 of 1912 was intended to deprive the State of

5. The majority in Price had difficulty with the concept of insusceptibility of private ownership as regards both "common" and "public" things. See Civil Code Articles 449, 450, 453, and 482. It has been said by two of the most authoritative scholars in this field that while public things and common things are not synonymous, both common and public things are insusceptible of private ownership insofar as they relate to things which are dedicated to the use of the public and are of the public domain. 2 Yiannopoulos, Louisiana Civil Law Treatise §§ 24, 29, 30; Dainow, Property, 15 La.L.Rev. 273, 275.

ownership of important commercial waterways or navigable bodies of water. The proper function of a limitation statute is to bar adverse claimants from enforcing rights against property upon the basis of defects in the title which, save for the statute of limitations, might render the title absolutely void. The statute of limitations is not intended to *create* a right of possession [ownership] when there is a total absence of authority for the inception of title; thus, the statute would not confirm title under a patent issued by an administrative official *acting without legislative sanction or authority.* * * *"

Act No. 62 of 1912 is a statute of prescription or peremption. It is pertinent to remember that prescription against the State must be *specifically* authorized by constitutional provision or other law. "* * * Prescription is stricti juris, and prescriptive statutes cannot be extended by analogy to cases beyond the strict letter of the law. State v. Stewart Bros. Cotton Co., 193 La. 16, 190 So. 317; Hayes v. Levy, La.App. 2 Cir., 81 So.2d 172 (see cases cited at 174); see 53 C.J.S. Limitation of Actions § 33." Coastal States Gas Producing Co. v. State Mineral Board, 199 So.2d 554 (La.App. 3rd Cir. 1967). More than this, because of the constitutional protection afforded the State from being adversely affected by prescription except upon express constitutional or statutory authority, prescription could never be pleaded against the State under implied authority. In Nelson v. Walker, 250 La. 545, 197 So.2d 619 (1967), quoting from the case of Succession of Delesdernier, 184 So.2d 37 (La.App. 4th Cir. 1966), this court said:

" 'This court has differentiated between absolute nullities in derogation of public order and good morals and those which are established in the interest of individuals. The latter nullities are susceptible of ratification, either expressly or impliedly, and may be prescribed against, while the former are never susceptible of ratification and can never be prescribed. * * *' * * ".

The inalienability of beds of navigable waters has been such a strong public policy, enunciated by codal articles, statutes, and finally the Constitution, that alienation adverse to that policy might be considered such a nullity as could never be validated by prescription, but most certainly it could never be made valid by prescription in the absence of express constitutional or statutory authority.

Here lies the egregious error of the majority in California Company v. Price. It holds that Act No. 62 of 1912 "by its explicit and unequivocal terms" repudiated positive codal and statutory law as well as jurisprudence and provided for prescription to run against the State *when there is actually no such express provision.*

"* * * It is a mild understatement to say that the *Humble* and *California* cases

focused on an issue of statutory interpretation about which there was great doubt and serious uncertainty. Of the six different opinions written in the *California* case, three are dissents. In the light of these facts, it cannot be denied that either one solution or the other could be sustained by reasonably adequate legal argument—especially since the so-called intent of the 1912 legislature *is necessarily an imputed intent* formulated by people here and now about what may or may not have been in the minds of other people more than forty years ago. *Under such circumstances, the decision of the case should have been in conformity with the public policy of the state,* that is, to sustain the inalienability by the state of the beds of navigable waters because they are insusceptible of private ownership." Dainow, Property, 15 La.L.Rev. 273.

" * * * The question presented in these cases [California and Duck Lake] was whether the 1912 act should be interpreted to exclude from its terms any patents which might embrace the beds or bottoms of navigable bays and lakes. *Despite the previous landmark decision of Miami Corporation v. State and the policy reflected in the Civil Code sustaining the legal doctrine that beds of navigable waters are insusceptible of private ownership, these cases rejected the view that the 1912 act excluded patents that embraced the beds of navigable waters.*

*"Because these decisions run counter to the policy expressed in the Civil Code and in the Constitution of 1921, and because it may be cogently argued that the interpretation given to Act 62 of 1912 does violence to the legislative intent,* it is easily understandable that the far-reaching effect of these decisions would evoke legislative action during the 1954 sessions. * * *"* Hebert and Lazarus, Legislation Affecting the Civil Code, 15 La.L.Rev. 9, 22.

" * * * In view of the court's repeated acknowledgement of the principle of state ownership of beds and navigable waters in the *Miami Corporation* decision, and further in view of the invocation of the same principle in the above quotation [from State v. Capdeville] with reference to the very act under which the successful litigant in the *Humble Oil Company* case claimed title [Act 87 of 1890], it is surprising that the conclusion reached in the instant case [Humble Oil] was so 'perfectly apparent.' * * *"* 14 La.L.Rev. 267, 273.

The comments quoted above are only a sampling of the adverse criticism by scholars in law reviews, books, and other legal publications. I have failed to find in my research any dissertation favorable to the strained interpretation given by the majority of this court to Act 62 of 1912 in California Company v. Price and its predecessors.

. Contrary to the majority holding in Price that the 1912 statute expressly applied to inalienable waterbottoms, the majority could read into the act only implied, not express, authority, for derogating from the strong public policy based upon express codal provisions, statutory law, and jurisprudence.

While citing numerous statutes which expressed the public policy of inalienability of the bottoms of navigable waters (omitting only the two earliest ones, Act No. 247 of 1855 and Act No. 124 of 1862), the majority in Price glided over this consistency of legislative intent. A contrary intent and policy were inferred from the broad, general language in a single statute which permits prescription or peremption to bar certain state claims. It is an extremely strained and stretched interpretation of this statute to hold that it ran counter to all prior legal authority which had prohibited the alienation of the beds of navigable waters, and to hold that such a broad, general statement by the Legislature had the effect of validating patents which, being in contravention of law and public policy, were absolute nullities when they were issued.

Finally, is it not inconsistent and anomalous that under our jurisprudence the bottoms of navigable waters are insusceptible of private ownership by accretion or dereliction and yet are susceptible of private ownership by grant or patent?

See Yiannopoulos, Common, Public, and Private Things in Louisiana: Civilian Tradition and Modern Practice, 21 La.L. Rev. 697, 722 at fn. 123.

Rather than further extend this already lengthy discussion of the holdings in Price and its predecessors, I refer the reader to the dissents of the then Chief Justice Fournet and Mr. Justice Hawthorne in California Company v. Price, and the dissents from refusal to grant writs in State v. Cenac of Mr. Justice Hawthorne, Mr. Justice Hamlin, and Mr. Justice Sanders as well as the full law review discussions and other writings cited above.

I am of the opinion that a correct resolution of the basic issue presented in the instant case would require the overruling of Price, Humble Oil, and Realty Operators, and I see sound reasons why this court should be willing to repudiate those decisions.

I would suggest the most pressing reason for overruling California Company v. Price and the weak jurisprudential foundation upon which it rests is that in the very year it was decided, the Legislative decisively, expressly, and affirmatively stated that the holding in the Price case was not the law. As previously noted, the majority in that case had inferred legislative approval of Price's predecessor cases from the Legislature's failure to pass amendatory law to nullify the holdings of

those cases. Act No. 727 of 1954, which (except for the severability clause and the clause repealing all laws in conflict) is now R.S. 9:1107–1109, reads:

"§ *1107.* *Public policy respecting owner-ship of navigable waters and beds thereof*

"It has been the public policy of the State of Louisiana at all times since its admission into the Union that all navigable waters and the beds of same within its boundaries are common or public things and insusceptible of private ownership; that no act of the Legislature of Louisiana has been enacted in contravention of said policy, and that the intent of the Legislature of this state at the time of the enactment of Act No. 62 of the year 1912, now appearing as R.S. 9:5661, and continuously thereafter was and is at this present time to ratify and confirm only those patents which conveyed or purported to convey public lands susceptible of private ownership of the nature and character, the alienation or transfer of which was authorized by law but not patents or transfers which purported to convey or transfer navigable waters and the beds of same.

"§ *1108.* *Invalidity of patent or transfer purporting to include naviga-ble waters and beds thereof*

"Any patent or transfer heretofore or hereafter issued or made is null and void, sofar as same purports to include such navigable waters and the beds thereof, as having been issued or made in contraven-tion of the public policy of this state and without any prior authorization by law; provided that the provisions of this Section shall not affect the laws of accretion or apply to lands that were susceptible to private ownership on the date of the patent or transfer by the state or a state agency.

"§ *1109.* *Statutes not to be construed as validating purported transfer of navigable waters or beds thereof*

"No statute enacted by the legislature of Louisiana shall be construed as to vali-date by reason of prescription or peremp-tion any patent or transfer issued by the state of any levee district thereof, so far as the same purports to include navigable or tide waters or the beds of same."

Neither the Supreme Court in the sec-ond California Company v. Price case, 234 La. 338, 99 So.2d 743 (1957) (which was decided upon a plea of res judicata), nor the Court of Appeal in State v. Cenac, supra, noted or considered this positive law. While I really find no need to use this statute (for in my opinion we should judicially declare that Act No. 62 of 1912 was never meant to affect patents to the bottoms of navigable waters), it is both an alternative reason and a buttressing rea-son for overruling the first California

Company case. Even though I assume arguendo that if the constitutionality of the 1954 act was challenged, we would be required to declare it unconstitutional, it nevertheless buttresses my reasons for overruling the Price decision. As previously noted, the Legislature has consistently during 100 years—in 1855, 1862, 1886, 1904, 1910, 1914, 1924, 1932, and now by Act No. 727 of 1954—expressed the public policy, which is in accord with the Civil Code provisions in effect since 1808, that the beds of all navigable waters belong to the State and are insusceptible of alienation to private interests. While before 1921 it was possible to provide expressly by statute that the beds of these waters could be alienated because only Code and statute law stood in the way, the Legislature never did so, and now the people have removed legislative authority in this field by providing in Article 4, Section 2, of the 1921 Constitution that there should be no alienation of "the fee of the bed of any navigable stream, lake or other body of water, except for purposes of reclamation". Certainly an unbroken line of legislation along with constitutional prohibition is indicative of the very strong public policy and intent of the Legislature. How can one brush aside lightly all of this under the single statute of repose which says that the State shall have six years in which to annul land patents or be barred from suit thereafter? Surely the Legislature's repeated express declarations, upon the numerous occasions it had in other laws to state the public policy of Louisiana of inalienability of navigable waters and their beds, are more potent than the void in and silence of the 1912 act in this regard.

Moving to a further consideration of the 1954 legislative act and still assuming it could be declared unconstitutional, I maintain that neither Price nor its predecessors formulated rules of property to be relied upon by the public. Article 1 of the Civil Code states: "Law is a solemn expression of *legislative* will." Ever since July 8, 1954 (about five weeks after the decision on rehearing in Price), the rule of law, the only rule of property, upon which the people of this state have had a right to rely is Act No. 727 of the Legislature of that year. That act and the vigorous dissents of three members of this court in Price gave notice to the world that private titles to bottoms of navigable waters were, at the very least, precarious and unreliable. The act, which carries the presumption of constitutionality, gave notice that the Legislature declared such titles null. There remains no reliable rule of property from Price and its predecessors when the act, following on the heels of that case, declared in effect that Price and the other decisions were erroneous. At least the warning flag was out for all the public to take note of the conflict and of the instability of titles to the beds of

navigable waters. It appears that there can be no reliance upon the so-called rule of property of the Price case when Article 1 of the Civil Code says law is the legislative voice, and here that voice spoke loudly and immediately.

Finally, in my view the concept of the so-called rule of property has little or no validity in this civilian jurisdiction. That concept stems from the theory of stare decisis, is founded entirely upon common law, and finds no basis in our Constitution, in our Civil Code, or in our statutory law. A study of the jurisprudence will show that the rule has been used in order to obtain a result in some cases but just as quickly discarded in other cases. I favor stability of law, of course, and constancy of jurisprudence. Here, however, the reversal of the Price, Humble, and Realty Operators cases would restore the constancy of the jurisprudence and reinstate the long-standing law and public policy of this state. As I said of another case in dissent in Pringle-Associated Mortgage Corporation v. Eanes, 254 La. 705, 226 So.2d 502, they "should be overruled as being erroneous, eddying alone and apart out of the mainstream of our law".

So far I have, even with the assumption of its unconstitutionality, used the act of 1954 to buttress my conclusion of the legislative intent and to give pressing rea-

son for overruling the Price case, which I contend is in error.

However, the act has never been challenged, and I have no right to assume it unconstitutional. Moreover, contrary to a Comment, 30 Tul.L.Rev. 115, 125, and the concurring opinion by Mr. Justice Summers in the denial of writs in State v. Cenac, I am of the opinion the statute is constitutional. I readily agree with those two writers that it is not wise to permit a Legislature to enact laws which state the intent of earlier Legislatures and which appear to make interpretations of previously existing laws contrary to interpretations by the courts. I agree that under the separation of powers of government and in the exercise of the judicial power, the interpretation and construction of legislative acts are generally within the exclusive province of the courts. I would adhere to the principle of separation of powers. However, the majority of this court in Price expressly told the Legislature that if it had found the court's interpretation incorrect in O'Brien, Realty Operators, and Humble, it could have corrected that interpretation. The lawmakers reacted by adopting the only legislation which could respond effectively to the judicial suggestion. If ever the Legislature were entitled to have an interpretive act upheld as not being an invasion of the judicial function or an abrogation of the theory of separation of powers of government,

certainly this legislation should be accorded that status. The legislation did not propose to apply to any patents involved in cases already adjudicated. Clearly the Legislature has not amended any prior law by Act No. 727 of 1954.

One need not be concerned that the act of 1954 is ex post facto, divesting vested rights without compensation in contravention of Article 1, Sections 9 and 10, and Amendment 5 of the United States Constitution and Article 4, Section 15, of the Louisiana Constitution. State ownership of the beds of navigable waters has, as previously shown, always been the law and the public policy of this state. No law has ever provided otherwise, and the Constitution of 1921 did not create this public policy but merely protected it. Therefore the act of 1954 has not changed any law; it is not a new law; it is not a new rule of law; it does not divest vested rights or impair contractual obligations.

Although I am reluctant to accept legislative interpretation in the face of judicial decision, there may never arise another occasion for the exception to be made, and it is merited here. If the 1954 legislation is accepted as an interpretive act and not as new law, there is no problem of impairment of contracts or divesting vested rights in violation of constitutional provisions.

Although I believe Act 727 of 1954 is constitutional and controlling of this case,

as previously noted I have no need to rely upon the legislative enactment, for I feel that this court should correct its own error and reestablish the positive law and jurisprudence from which the Realty Operators, Humble and Price cases departed. The conclusion of the court in those cases as to the interpretation of Act No. 62 of 1912 is built upon a tenuous and untenable foundation and is inversely pyramided. That jurisprudence begins with dicta, continues without resort to law, and ends in what it calls an "unbroken line of jurisprudence".

Properly interpreted, Act No. 62 of 1912 has no application to patents to the beds of navigable waters. Act No. 727 of 1954 is an alternative basis as well as a supporting reason for overruling Price and its predecessors. I respectfully concur in the result here reached, being, however, of the opinion that the reasoning leading to that result pretermitted the real and pervading issue in this case.

*On Application for Rehearing*

Rehearing denied.

TATE, Justice (concurring in denial).

I adhere to my view that the present litigation does not squarely present to us the question of overruling California Co. v. Price, 225 La. 706, 74 So.2d 1 (1954). However, in view of my brother Barham's concurring opinion, it may not be inappropriate

for me to state that, if and when the question is presented to this court, I concur with his views that the *Price* decision should be overruled.

My essential reasoning in this regard is contained in the forceful dissent of Chief Justice Fournet to the *Price* decision, 74 So. 2d 15:

"* * * I am convinced the holding in the majority does violence to the basic and fundamental principles upon which the holding in the comparatively recent decision of Miami Corporation v. State, 186 La. 784, 173 So. 315 [1936], is predicated, that is, that the title to the bottoms of navigable beds of water, and particularly those that form a part or an arm of the sea, are unsusceptible of private ownership, i. e., cannot be owned by private individuals; and, therefore, the majority ruling in effect overrules the holding in the Miami case that when land bordering such streams becomes submerged under the waters thereof and, as a result, forms a part of its bed, the owner is divested of his title thereto and it thereupon becomes vested in the state for the benefit of and in trust for the people as a whole.

"Viewed in the light of this public policy that is established by codal articles that have been interpreted and reaffirmed in an unbroken line of jurisprudence for more than a century—and which is also reflective of a rule that is firmly grounded in the law and jurisprudence universally obtaining in all of the states—I have no doubt that if this were an original test of legislative intent in adopting Act No. 62 of 1912, the statute could, despite its all-embracive language, very easily be construed to mean that the legislature did not intend thereby to include within its purview the beds of navigable streams, and particularly those connected with or forming a part of or being an arm of the sea, but only such lands as the state would, in the ordinary course of events, have available for sale on the open market. In my opinion, such a construction is logical and sound, leading to no absurd consequences."

Insofar as it is suggested that we should not disturb a "rule of property" represented by this single decision of our closely divided court, almost universally criticized by the commentators, our earlier expression in Miami Corp. v. State, 186 La. 784, 173 So. 315, 320 (1936), under similar circumstances, is applicable: "In Louisiana, this court has never hesitated to overrule a line of decisions where they establish a rule of property when greater harm would result from perpetuating the error rather than from correcting."

I thus join with the views expressed by Justices Hawthorne, Hamlin and Sanders (the latter two still members of this court) in their dissent from the denial of certiorari at State v. Cenac, 241 La. 1055, 132 So.2d 928, 930, 936 (1961).

If and when this court is squarely faced with the necessity of overruling California Co. v. Price, there is much merit in the suggestion of Justice Hamlin in *Cenac,* 132 So. 2d 936, that those who have incurred expenditures as the result of mistaken reliance upon our *Price* decision should recover any good faith and reasonable costs of acquisition and development expended by them, such reasonable good faith expenditures to be a charge against any revenues derived by the State from its property thus reclaimed.

Further, it seems to me there may be merit in concluding that such possessors in good faith should not be required to account to the true owner (the State) for revenues they may have derived from the State's property up until the time the State

makes formal claim. for its restitution, whether such revenues be technically "fruits" or not. We would thus be according such possessors the benefits equivalent to those usually accorded possessors in good faith. See La.Civil Code Article 3543.

It should probably also be noted there will be a special problem of res judicata as to those who have litigated the question and whose ownership of this inalienable property of the State is now recognized by a definitive and probably unassailable judgment.

For the reasons noted, I therefore concur. with Justice Barham's views, as expressed by his concurring opinion; however, I do not believe the *Price* question is actually before this court in this litigation.